2012 VT 18

# Rathe Salvage, Inc. v. R. Brown & Sons, Inc., Robert E. Brown and Stephanie A. Brown

[46 A.3d 891]

No. 10-356

Present: Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.

Opinion Filed March 23, 2012

*Eric A. Poehlmann* and *Jennifer E. McDonald* of *Downs Rachlin Martin PLLC*, Burlington, for Plaintiff-Appellee/Cross-Appellant.

*Peter F. Langrock, Frank H. Langrock* and *Devin McLaughlin* of *Langrock Sperry & Wool, LLP*, Middlebury, for Defendants-Appellants/Cross-Appellees.

¶ 1. **Burgess, J.** Following a jury trial, defendants R. Brown & Sons, Inc., a scrap metal hauling company, and its principal, Robert Brown (both referred to as hauler), were found liable for breach of contract, common law fraud, trespass, breach of the implied covenant of good faith and fair dealing, and consumer fraud. Each of these claims stemmed from hauler's commercial dealings with plaintiff Rathe Salvage, Inc., a scrap metal salvage yard where hauler would crush cars and transport the scrap for sale to steel mills. Hauler was later granted judgment as a matter of law by the trial court overturning the jury's finding of a consumer fraud violation. Hauler now appeals, arguing that: (1) the trial court erred in denying judgment in hauler's favor on the remaining claims because the verdicts were based on insufficient evidence; (2) it is entitled to a new trial because Rathe Salvage's attorney improperly argued to the jury that opposing counsel was implicated in withholding evidence; and (3) the case should be remanded due to the trial court's refusal to conduct a *Daubert* hearing on the admissibility of hauler's polygraph, or lie detector, testing before excluding such evidence from trial. Rathe Salvage cross-appeals from the trial court's judgment in favor of hauler on the consumer fraud claim. We affirm the judgment of the trial court on all four issues.

¶ 2. The following facts are not in dispute. Rathe Salvage is in the business of acquiring old motor vehicles to sell for spare parts and scrap metal. For several decades Rathe Salvage did business with hauler, which is in the business of crushing and transporting scrap metal for sale. The typical pattern of their transactions was that the parties would agree on the price per ton of scrap metal, Rathe Salvage would identify the junked vehicles to be sold, and hauler would crush the junks for transport to a Montreal steel mill. It was understood that each load would be weighed at the mill, hauler would be paid by the mill, and Rathe Salvage would be paid by the hauler at the previously agreed upon price per ton. Rathe relied upon handwritten weigh slips presented by hauler to figure the tons for which their price per ton was due.

¶ 3. In late 2003, Rathe Salvage terminated this arrangement and contracted with another trucking company. Although the

replacement company bought and transported what Rathe Salvage contended were the same kinds of loads, Rathe noticed that the typical load weights reported by the new trucker — and thus, the typical payments received — were significantly higher than those reported by defendant hauler. Although hauler offered several reasons why the replacement trucker's loads were heavier, Rathe Salvage inferred from the difference that hauler had been submitting fraudulent weigh slips, and it sued for, for purposes of this appeal, breach of contract, fraud, and consumer fraud, the last claim based on the allegation that Rathe was a consumer of hauler's services.

¶ 4. Early in the pretrial proceedings, Rathe Salvage moved to compel hauler to produce copies of the steel mill's weigh slip records. Finding that hauler failed to abide by this discovery request, the trial court sanctioned hauler with a default judgment on the issue of liability. This was followed by a later judgment for damages. On appeal, this Court reversed the default judgment, agreeing that, while hauler produced copies of its version of mill transactions in its possession, the steel mill's own records were not under hauler's control, and that the court could not compel hauler to produce the mill's documentation. *Rathe Salvage, Inc. v. R. Brown & Sons, Inc.*, 2008 VT 99, ¶ 18, 184 Vt. 355, 965 A.2d 460. The case was then remanded for further proceedings.

¶ 5. Before the subsequent trial, hauler filed a motion in limine to allow testimony from a polygraph expert on the results of a polygraph examination of Robert Brown, hauler's principal. The trial court denied this motion, noting that this testimony would "invade the province of the jury," and so was inadmissible, per se, regardless of its purported reliability. The court thus declined, over hauler's objection, to hear its proffered evidence of polygraph reliability as a necessary precondition to admitting expert testimony. See V.R.E. 702 (allowing qualified experts to testify where "scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue").

¶ 6. The jury did hear evidence, however, about discrepancies between the tons of scrap as reported and paid for by hauler and tons of scrap actually received and sold to the steel mill. One of hauler's former drivers testified that a typical load from the salvage yard weighed significantly more than the average weight reported by hauler. In addition, the owner of another salvage yard

who had worked with hauler testified that hauler's reported load weights were much lower than loads transported by other carriers. The jury was told that, after Rathe Salvage ended its business with hauler, the yard shipped several loads of scrap crushed and bundled at the yard by hauler. Upon delivery to the mill, Rathe Salvage discovered that these loads averaged twenty tons, while hauler consistently reported loads averaging fifteen tons. The jury also heard that hauler directed the mill, with whom it enjoyed a close working relationship, not to disclose its records.

¶ 7. At closing argument, Rathe Salvage highlighted the fact that hauler and its counsel recently visited the steel mill in preparation for the trial, yet failed to retrieve the mill's weigh slips for hauler's deliveries of scrap from Rathe Salvage. Objecting, hauler complained that the argument was "not in the evidence," and that it improperly accused hauler's counsel of conspiring in not getting the mill's weight slips. The court declined to give a curative instruction as requested by hauler, noting that the same argument had been made earlier in the trial and that the court inferred no untoward accusation against counsel from the remarks.

¶ 8. After the jury's verdict for Rathe Salvage on all claims at issue on this appeal,[1] hauler renewed its motions for judgment as a matter of law. The trial court granted judgment for hauler on the consumer fraud claim, but entered judgment for Rathe on the rest of the verdict. With respect to the consumer fraud claim, the court found that the transaction was clearly a sale of junked cars by Rathe Salvage and not a purchase of hauler's transporting or scrap processing services, opining that the only basis for Rathe's claim at trial was that hauler did not pay when it picked up the scrap, and that was because there was no scale at the yard. On that proof, the court reasoned, there was no evidence that Rathe Salvage paid hauler for services. Because Rathe Salvage was not, then, a "consumer" as defined by the Consumer Fraud Act, the corresponding verdict against hauler was vacated.

---

[1] The jury did find Rathe liable on hauler's counterclaims for conversion and trespass, but these claims are not directly related to the matters before this Court, and the associated jury award amounted to a small fraction of the total sum awarded to salvage yard.

## I.

¶ 9. Hauler contends that the evidence was insufficient to support the common law fraud verdict. On appeal, we apply the same standard as the trial court, asking "whether, taking the evidence in the light most favorable to the prevailing party and excluding any modifying evidence, there is any evidence which fairly and reasonably tends to support the jury verdict." *Turgeon v. Schneider*, 150 Vt. 268, 270, 553 A.2d 548, 550 (1988). The evidence presented by Rathe Salvage met this standard.

¶ 10. Hauler asserts that Rathe's case rests entirely on inferences drawn from the fact that the steel mill did not produce its weigh slips for hauler's loads of Rathe Salvage scrap. This characterization, however, ignores the totality of the evidence. First, Rathe Salvage presented testimony from several different drivers and carriers indicating that the weights reported by hauler to Rathe were consistently short of the actual tons hauled. For example, one of hauler's former drivers calculated that the nine bundles of three scrapped cars each on every load, with each car weighing at least a ton apiece, averaged over twenty-seven tons per load, while hauler's comparative weight slips claimed around fifteen to sixteen tons per load. Hauler's own testimony concerning the origins of its weight receipts was that the weights for Rathe's scrap would be date-stamped by the Montreal mill's computerized weigh station on hauler's letterhead. According to hauler, the weights were handwritten while the date stamps were converted, by the mill pressing a button, to an American-style month-day-year format. Rathe Salvage's contradicting evidence was that another carrier of its scrap to the same Montreal mill received weight slips printed on mill letterhead by its computer with the load weights straightforwardly stamped, rather than written, on the receipt and the dates stamped as well, but in the European convention of day-month-year. There was an abundance of circumstantial evidence, some of which is described above, that for years hauler generally represented his loads as not exceeding fifteen tons, when comparable loads later proved to weigh at least twenty tons. The jury was free to consider inculpatory hauler's earlier instruction to the mill not to share its original transaction records. Taking the evidence in a light most favorable to the prevailing party, the jury could have reasonably inferred deception on the part of hauler as to tonnage and fabrication of its weight receipts.

## II.

 ¶ 11. Hauler next asserts that a curative instruction was required to offset prejudice created by Rathe Salvage's closing argument allegedly accusing defense counsel of complicity in withholding the mill documentation. Specifically, hauler objected to the remark that its counsel accompanied hauler to the mill to take photographs for trial, but inexplicably failed to return with the mill's actual weigh slips. When a party is accused of improper argument, this Court looks for prejudice warranting a new trial. *Keus v. Brooks Drug, Inc.*, 163 Vt. 1, 7-8, 652 A.2d 475, 480 (1994). Here, we review the trial court's determination that there was no prejudice, and its consequent decision not to deliver a curative instruction, for abuse of discretion. See *Debus v. Grand Union Stores of Vt.*, 159 Vt. 537, 545, 621 A.2d 1288, 1293 (1993) (using abuse of discretion standard to review whether reference in closing argument to defendant's corporate status created prejudicial effect that would merit curative instruction); see also *Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d 534, 540 (2d Cir. 1992) (holding that abuse of discretion standard is generally appropriate for determining whether improper conduct caused prejudice).[2]

 ¶ 12. In considering this claim, it is important to note that everything in the contested portions of the closing argument was factually accurate and supported by the record. It is undisputed that hauler and defense counsel travelled to the mill and did not retrieve the mill's weigh slips. Any prejudice from this argument derives, not from hauler's lawyer going with him to the mill, but from hauler's failure to obtain, without sufficient explanation, the original scale slips that could corroborate the delivery weights claimed and so resolve the case. Given hauler's admission on cross-examination that he told the mill not to turn over his business records to plaintiff in this case, the argument was fair comment. There was nothing facially improper about arguing the point.

---

[2] Hauler cites *Pappas* for the proposition that unusual circumstances can necessitate a stricter standard of review. In *Pappas*, however, the circuit court strayed from an abuse-of-discretion standard because the lower court did not correct counsel's blatant appeal to regional bias — a primary concern of federal courts hearing cases under diversity jurisdiction. 963 F.2d at 539-40. No such concern arises here.

■ ¶ 13. As to whether the argument was open to improper inferences necessitating a corrective instruction, we defer to the judgment of the trial court. The trial court enjoys a "superior vantage point when evaluating the possible impact of the alleged prejudicial conduct," *Pappas*, 963 F.2d at 540, and the trial court in the case at bar found that "[n]othing in [the] argument suggests wrongdoing by counsel." The trial court correctly noted the possibility of alternative inferences equal to or more plausible than hauler's characterization of the argument as impugning the honesty of its counsel. Indeed, in context, Rathe Salvage's reference to hauler's counsel's accompaniment to the mill appears merely incidental to hauler's opportunity, but failure, to secure exculpatory evidence just prior to trial, and was not designed to implicate counsel in any sort of misconduct. The trial court's refusal to give a special instruction on this point was no abuse of discretion.

## III.

¶ 14. Appellant also argues that the trial court erred by refusing to admit expert testimony about the results of a polygraph examination commissioned and submitted to by hauler. The court denied hauler's motion to convene a *Daubert* hearing, so called, for purposes of determining the underlying reliability of polygraphy. See *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993) (requiring reliability screening by trial judges against indicia of reliability of proffered scientific evidence as a precondition to admissibility of expert testimony under Federal Rule of Evidence 702); *State v. Brooks*, 162 Vt. 26, 30, 643 A.2d 226, 229 (1993) (adopting *Daubert* as the applicable standard for admitting scientific evidence under V.R.E. 702); see also Reporter's Notes, V.R.E. 702 (incorporating *Daubert* into rule for admissibility of expert testimony); *985 Assocs., Ltd. v. Daewoo Elecs. Am., Inc.*, 2008 VT 14, ¶ 8, 183 Vt. 208, 945 A.2d 381 (reiterating the trial court's gatekeeping function under *Daubert* to "keep misleading 'junk science' propagated primarily for litigation purposes out of the courtroom"). Concerned that the point of hauler's polygraph examiner was to tell the jury "what and who should be believed," the court here ruled that even if polygraph results could satisfy *Daubert* admissibility standards, it was nevertheless precluded as an impermissible infringement on the jury's province to determine credibility. In support of its conclusion, the court cited *United*

*States v. Sayavongsa*, No. H-07-338-2, 2008 WL 2325622, at *4 (S.D. Tex., June 3, 2008), for the proposition that polygraph evidence "emanates an inference of infallibility which improperly interferes with this critical role of the finder of fact · as the determiner of credibility."

¶ 15. Endorsing a per se ban on the admissibility of polygraph results, the *Sayavongsa* ruling relied also on Federal Rule of Evidence 403, which then provided for the exclusion of relevant evidence if "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, . . . or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."[3] *Id.* The court recognized that "where [Rule 403] warrants exclusion of polygraph evidence, district courts need not conduct a *Daubert* hearing or detail a Rule 702 analysis," and opined that "even if the tendered polygraph evidence had ample reliability and relevance so as to be admissible under Rule 702, it would be excluded under Rule 403." *Id.* Although not so explained explicitly below, the trial court's exclusion of the polygraph results is sustainable on per se grounds founded in Vermont Rule of Evidence 403. See *Hudson v. Town of E. Montpelier*, 161 Vt. 168, 170, 638 A.2d 561, 563 (1993) (explaining that this Court "need not adopt the [trial] court's rationale in affirming its conclusion").

¶ 16. The admissibility of polygraph evidence is one of first impression in Vermont.[4] Both parties posit, and we agree, that the ruling is appropriately analyzed under Rule 403, which is the same in substance as the federal rule relied upon in *Sayavongsa*. Rule 403 admissibility determinations are usually based on a case-by-case weighing of the evidence's probative worth against its risk of unfair prejudice, confusion, and the like, and are reviewed for abuse of discretion. See *State v. Webster*, 165 Vt. 54, 56, 675 A.2d 1330, 1332 (1996) (recognizing that trial court has discretion in balancing such factors, and that its rulings will not be disturbed "absent a showing of an abuse of that discretion"). The court here, however, adopting the *Sayavongsa* rationale, excluded the polygraph evidence as per se inadmissible under Rule 403 as a matter

---

[3] Since the court's decision, the language of Federal Rule of Evidence 403 has changed slightly, but remains the same in substance.

[4] This Court had the opportunity to rule on the admissibility of polygraph evidence in *State v. Hamlin*, 146 Vt. 97, 109-10, 499 A.2d 45, 54 (1985), but declined to do so, noting only that most jurisdictions exclude it.

of law. Accordingly, its ruling will be examined de novo. See *In re Vill. Assocs. Act 250 Land Use Permit*, 2010 VT 42A, ¶ 7, 188 Vt. 113, 998 A.2d 712 (reiterating that questions of law are reviewed de novo). Moreover, we approach the question of the polygraph's Rule 403 admissibility in the same position as the trial court by assuming, without deciding, that polygraphy is sufficiently reliable for admissibility under *Daubert.*

¶ 17. As with its federal counterpart, Vermont Rule 403 calls for balancing the probative value of polygraphy against its potential for undue prejudice, confusion, and delay. See V.R.E. 403 (providing for the exclusion of relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues . . . or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence"). Hauler proffers that the polygraph evidence in this case would be probative in "supporting Mr. Brown's claim that he was telling the truth when he said he did not defraud Mr. Rathe." Hauler also argues that its polygraph evidence would not usurp the jury's role in determining credibility because it offers no opinion about the truthfulness of a witness. Rather, it would be the witness's measurable physiological reaction reflecting the presence, or not, of deceptive stress, that would be introduced for the jury's consideration in assessing the veracity of a witness's prior consistent statement.[5] Thus, maintains hauler, the expert was asked to opine not on hauler's truthfulness, but on nothing more than observable manifestations of his physiological stress consistent, or not, with indicia of truthfulness.

¶ 18. Like the trial court, we find this a distinction without a practical difference. The probative value of the polygraph results, at least in theory, rests on the expert's ability to assess physiological responses of the subject as consistent with either truthfulness or deception. As explained in hauler's motion in limine, the expert would "give the jury a scientific basis and specific information that might be of some help in determining whether [hauler] told the truth on the stand." Although indirectly, the polygraph results and the expert's interpretation still purport to measure the declarant's veracity. As observed by the United

---

[5] Other apparently related evidentiary issues, such as the admissibility of hearsay and a prior consistent statement, were not raised on appeal, and we do not consider these questions here.

States Supreme Court in *United States v. Scheffer*, 523 U.S. 303, 313 (1998), "a polygraph expert can supply the jury only with another opinion . . . about whether the witness was telling the truth."

¶ 19. It is long settled that "the *jury* is the lie detector." *Id.* (quotation omitted). This responsibility to determine the "weight and credibility of witness testimony, therefore, has long been held to be the part of every case [that] belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men." *Id.* (quotation omitted). That polygraphy, as here, is offered to supplement what is already the jury's unadorned core function diminishes, rather than enhances, its probative value since it is redundant, purporting to do only what the jury is already destined to determine. If, as we assume, polygraphy is generally accepted as accurate and reliable, the polygraph cannot but usurp the jury's lie detecting function.

¶ 20. Excluding polygraph results as per se intrusive upon the jury's prerogative, some courts further justify the exclusion in terms of avoiding unfair prejudice, confusion, waste of time, and delay. See *id.* at 314 (concluding that categorical ban of polygraph evidence was in part justified by legitimate interest in avoiding inevitable collateral litigation over the test administration, examiner qualifications, interpretation and countermeasure distortion that would prolong criminal trials and "threaten[ ] to distract the jury from its central function of determining guilt or innocence"); *Sayavongsa*, 2008 WL 2325622, at *4. In *State v. Porter*, 698 A.2d 739 (Conn. 1997), the Connecticut Supreme Court declined to abandon its traditional per se bar against polygraph evidence, even if admissible under *Daubert*, due to prejudice "greatly exceed[ing] its probative value," *id.* at 758, and because of inevitable "regular and immensely time consuming 'battles of the experts,' " *id.* at 771. The variables upon which polygraph accuracy depends were not discussed below, but were acknowledged in the submissions supporting hauler's motion. These include the relative skill of the examiner, the conditioning of the subject, and the circumstances of the examination. See Nat'l Research Council of the Nat'l Acads., The Polygraph & Lie Detection 121-53 (2003), available at http://www.nap.edu/openbook.php?isbn=0309084369

[hereinafter NAS Report] (discussing factors influencing polygraph accuracy).[6]

¶ 21. Skirmishes over these factors present inescapable opportunities for litigation on collateral issues underlying Rule 403 balancing of probative weight against distraction, delay and confusion. Questions concerning the polygraph's reliability in a particular case would unavoidably invite testimonial duels between experts over the tactics and circumstances of the examination itself. Hauler's proffer concerning the relatively low polygraph error rate is illustrative. The motion in limine asserts accuracy in excess of ninety-three to ninety-eight percent and posits that the two to seven percent difference is simply fair game for cross-examination. Reiterating the same point on appeal, hauler quotes further from the NAS Report:

> [E]mpirical data clearly indicate that for several populations *of naive examinees not trained in countermeasures,* polygraph tests for event-specific investigation detect deception at rates well above those expected from random guessing. . . . The studies report accuracy levels comparable to various diagnostic tests used in medicine.

*Id.* at 149 (emphasis added). The question of whether the examinee is naive and untrained in countermeasures (assuming it could be determined that all countermeasures are detectable in a subject trained in countermeasures) would presumably spark its own inquiry which, in turn, would call for more expert explanation and rebuttal, all turning on credentials, experience, and facts increasingly remote from the actual case at hand. Avoiding such diversions was one premise in support of per se exclusion in *Scheffer, Sayavongsa,* and *Porter* even after assuming relevance under *Daubert,* while hauler's proffer invites the same kinds of distraction. See also D. Kaye et al., The New Wigmore: A Treatise of Evidence: Expert Evidence § 1.5.1(c), at 29 (1st ed. 2004) (noting that polygraph evidence may offer no less waste of time

---

[6] While we assume polygraphy is scientifically relevant to truth detecting, it is noteworthy that the full NAS Report cautions that "[t]est performance is far below perfection and highly variable across situations," and qualifies its more general statements about polygraph accuracy with the acknowledgement that "[e]xisting polygraph field studies have used research designs highly vulnerable to biases, most of which exaggerate polygraph accuracy." *Id.* at 149.

and jury confusion, in return for no greater probative value, than disputed expert psychiatric assessments of credibility).

¶ 22. Per se exclusion is also supported by our holdings against expert opinions on ultimate legal issues or credibility in litigation. See *Riess v. A.O. Smith Corp.*, 150 Vt. 527, 530-32, 556 A.2d 68, 70-72 (1988) (explaining that notwithstanding authority under Vermont Rule of Evidence 704 to present opinion evidence that "embraces an ultimate issue to be decided by the trier of fact," it was error to allow testimony on ultimate questions of law equivalent to "should [defendant] lose?"); *Town of Brighton v. Griffin*, 148 Vt. 264, 271, 532 A.2d 1292, 1296 (1987) (excluding witness opinions on questions of law). Similarly, Rule 702 is no license for expert opinion on the truthfulness of a witness or guilt or innocence of a defendant. See *State v. Gokey*, 154 Vt. 129, 139-40, 574 A.2d 766, 771 (1990) (reserving those issues for the jury).

¶ 23. The polygraph expert's opinion in this case vouching for hauler's denial of fraud would amount to an opinion confirming hauler's veracity and the legal insufficiency of Rathe Salvage's fraud claim against him. Hauler asserts that the jury would not be told his denials were truthful, but that his physiological reactions at the time of a similar declaration were, in the opinion of the expert, inconsistent with deception or consistent with truth-telling. Again, as noted by the trial court, the distinction between the proffer and impermissibly certifying hauler's veracity, and so deciding the case, is difficult, if not impossible, to recognize. Even if treated as a strictly factual, rather than legal, opinion, the expert's testimony is practically inseparable from its legal implication: lack of scientific indicia of deception infers a truthful denial of fraud which tells the jury no fraud occurred. As it was error in *Riess* to admit an opinion that a defendant was liable for negligence in its installation of a propane tank regulator, so it would have been error to allow a polygraph expert to testify, in effect if not explicitly, that a fraud defendant was innocent of fraud.

■ ¶ 24. Hauler's argument that the excluding rationale of *Scheffer* is dated and not to be followed is unconvincing. We hold that polygraph examination results are redundant to, and an unnecessary influence on, a jury's responsibility to judge witness credibility or party liability, and that this limited, if not absence of, probative value is substantially outweighed by risks of confu-

sion, delay, and time wasted on collateral issues related to variables in administration of the polygraph. There was no error in the trial court's per se exclusion of polygraph evidence under Rule 403. Because polygraphy is inadmissible under Rule 403, the trial court was not required to conduct a *Daubert* hearing to assess its reliability under Rule 702.

## IV.

¶ 25. Rathe Salvage's cross-appeal — that the trial court erred in granting hauler's renewed motion for judgment as a matter of law on its consumer fraud claim — is reviewed de novo. *Downtown Barre Dev. v. GU Mkts. of Barre, LLC*, 2011 VT 45, ¶ 8, 189 Vt. 637, 22 A.3d 1174 (mem.). Accordingly, the claim is evaluated by the same standard applied to hauler's judgment as a matter of law motion: "whether, taking the evidence in the light most favorable to the prevailing party and excluding any modifying evidence, there is any evidence which fairly and reasonably tends to support the jury verdict." *Turgeon*, 150 Vt. at 270, 553 A.2d at 550. We affirm the trial court's holding that there is no such evidence.

¶ 26. In its complaint, Rathe Salvage claimed to be a consumer of services purchased from hauler and that hauler's misrepresentations of weight in redeeming Rathe's scrap metal was actionable under Vermont's Consumer Fraud Act (CFA). The Act authorizes recovery of damages and attorney's fees for "[a]ny consumer who contracts for goods or services in reliance upon false or fraudulent representations or practices" made in commerce in violation of the CFA. 9 V.S.A. § 2461(b). Section 2451a(a) of the act defines "consumer," in pertinent part, as anyone "who purchases, leases, contracts for, or otherwise agrees to pay consideration for goods or services . . . in connection with the operation of his or her business." Assuming misrepresentation on the part of defendant, it remained incumbent on Rathe Salvage to prove itself a "consumer" under the statute.

¶ 27. Hauler contends that, notwithstanding the jury's verdict in favor of Rathe Salvage on this count, there was no evidence from which the jury could find Rathe was a "consumer" as required for judgment under the Act. Hauler argues that the evidence showed that the scrap transactions were a one way street: that it simply bought scrap metal by the ton from Rathe Salvage. Hauler

asserts that the trial court was correct in ruling that no evidence supported the claim that it sold anything — neither product nor service — to the salvage yard.

¶ 28. On the other hand, Rathe Salvage insists it had a brokerage arrangement with hauler, by which hauler was hired to crush the cars for the salvage yard, to procure buyers for the scrap, and then deliver the scrap to the purchasing mills in return for some percentage of the mill's payment. In support, Rathe points to hauler's own testimony referring to himself as a "broker," Rathe as a "customer," and describing periodic summaries of scrap weights hauled as "invoices." Rathe cites this and his own testimony reflecting the same or similar characterizations as evidence supporting the premise that Rathe Salvage paid hauler for services and so was a consumer under the Act.

¶ 29. What proves the parties' actual buyer-seller relationship, however, is not how they label their activities. Rather, the proof of their relationship is in the testimony about how their transactions were carried out in fact and comparing those facts to the CFA's definition of "consumer." From the testimony about how the sales and purchases were actually conducted, the court concluded that the evidence proved only that hauler bought scrap from the salvage yard at an agreed-upon price per ton, and that the salvage yard purchased no goods or services from hauler. Having purchased nothing, explained the court, Rathe Salvage was no "consumer" under the Act.

¶ 30. Looking to the undisputed facts as testified to by both Rathe and hauler, the court was correct. According to Rathe, hauler's "primary business" was going to salvage yards to "crush their steel, pay them for the — whatever steel he crushed, and . . . [he] made his profit doing that." Rathe recounted that the salvage yard would ask hauler for the current price, "because the prices fluctuate, markets fluctuate" and they would "come to a consensus as to what [hauler is] paying per ton." Upon Rathe's agreement on the price, hauler would crush the cars at the salvage yard and "would pay us forty dollars a ton, and whatever it weighed, you multiply it, that's what we got paid." Rathe reiterated, more than once, that after hauler "crushed the cars, he'd give us a price so much per ton, and pay us for the weight that he took out." Thus, Rathe's evidence was that hauler bought the yard's scrap for an agreed upon price. Hauler's testimony was

essentially the same — that it bought the scrap at the yard for an accepted price and paid after delivering the metal to the mills.[7] Consistent with this evidence, and absent any competing version of their transactions, the court determined post-trial that hauler bought the scrapped cars, owned the scrap, and paid Rathe for the scrap, according to its purported weight.

¶ 31. That hauler referred to itself as a "broker," Rathe as a "customer," and its delivery summaries as "invoices" neither disproved Rathe's factual history of their business nor undermined the court's conclusion. Hauler testified to no facts, as opposed to characterizations, that contradicted Rathe's description of events. As the court found, there was no evidence that hauler actually facilitated, or "brokered," any business between the salvage yard and the mill. Indeed, there was no evidence of any business relationship evident between Rathe and the mill. Hauler's misuse of the term "customer" was acknowledged by Rathe Salvage on the record.[8] Similarly, hauler's reference to its mill delivery summaries as "invoices" did not convert the summaries into actual invoices for services where the evidence showed no services were offered or purchased. Terminology aside, hauler's testimony corroborated Rathe Salvage's testimony that hauler always bought the scrap by the ton, thus leaving Rathe's bald claim that hauler was paid on a percentage basis wholly unsupported by its own testimony.

■ ¶ 32. Nor should the fact, emphasized by the salvage yard, that hauler paid nothing in advance of crushing and transporting the scrap alter the court's conclusion. The court concluded that title to the junked cars passed to the hauler when turned over by Rathe upon their agreement on price. This is supported by Vermont's Uniform Commercial Code (UCC), 9A V.S.A. Article 2, which applies to contracts for the sale of goods "movable at the time of identification to the contract for sale," 9A V.S.A. § 2-105(1), § 2-401(2), which provides that title passes to buyer when "seller

---

[7] This was further supported, and never disputed, whenever Rathe described the particulars of their dealing. He agreed that he "sold scrap" to hauler and that the "price" offered in return was "fair" compared to prices offered by others. Rathe said that hauler "paid me for scrap cars, yes, and tin," but paid late for a while, prompting Rathe to demand, when hauler crushed cars, "payment in thirty days."

[8] In its closing argument, Rathe Salvage pointed out that hauler mistakenly analogized to a clothing store being its "customer" when hauler would buy a suit there.

completes his performance with reference to physical delivery of the goods."

¶ 33. In this regard, the parties accepted the court's instruction, consistent with § 2-401(2), in response to a jury question about when "ownership" of the steel changed, that: "Unless the parties have a different agreement, ownership of the property changes when a seller completes delivery of the property to a buyer." As already set forth, the evidence supports only that the salvage yard completed delivery to hauler in return for the agreed upon price. Notwithstanding the parties' labeling their relationship as one of "middleman," "broker," or "customer," there was no evidence of any arrangement other than the yard selling scrap to hauler at a price established between them.

¶ 34. Rathe's argument that the scrap remained salvage yard property until turned over to the mill is unsupported and unpersuasive. There was no evidence that delivery to hauler was conditional or contingent. The only evidence of their deal was that hauler offered a price for scrap, the salvage yard agreed, and that hauler then crushed the cars and picked up the scrap. At that point there was nothing more for Rathe Salvage to do "with reference to the physical delivery of the goods," and its delivery was complete. 9A V.S.A. § 2-401(2). As the court commented, hauler was figuratively free to dump the scrapped cars into a lake if it chose — its only obligation was to pay the yard the agreed-upon price per ton.

¶ 35. Hauler points to *3Com Corp. v. Electronic Recovery Specialists, Inc.*, 104 F. Supp. 2d 932 (N.D. Ill. 2000), relied on by the trial court, where the court rejected a salvage yard's argument that a hauler was a seller of services to the yard when it agreed to pick up scrap, sell it to third parties, and pay the yard seventy percent of the realized price. *Id.* at 935. The *3Com* court concluded that the yard's claimed posture as a buyer of services, instead of a seller of scrap, was a "tortured description of a relatively straightforward business relationship. . . . [T]he agreement . . . was a contract for sale of goods and not for rendition of services. [Defendant hauler] purchased scrap from [plaintiff yard], paying [plaintiff] 70% of the scrap's resale value. Plaintiff cannot be considered the consumer in this relationship." *Id.* at 939.

¶ 36. Rathe's efforts to distinguish its situation from *3Com* are unavailing. Rathe Salvage notes, correctly, that unlike Vermont's

CFA, the Illinois statute expressly addressed the purchase of merchandise, rather than services. See *id.* at 939 (outlining Illinois consumer fraud statute). Nevertheless, the *3Com* court analyzed the case in terms of whether the hauler sold "services" as claimed by the salvage yard, and held that hauling and selling scrap for thirty percent of its realized value was not a sale of services to the scrap yard, but a "sale of goods" to hauler. In any event, the instant case presents a simple sale of scrap metal with no arrangement for a split percentage or shared proceeds where the evidence was only that hauler purchased scrap from the yard at a stated price per ton.

¶ 37. The same undisputed facts fail to support Rathe's argument that UCC Article 2, governing sales and transfers of title to goods, does not apply where the "predominant purpose" of the parties' transaction was for the purchase of services, such as crushing and hauling, instead of selling goods like scrap metal. See *Lamell Lumber Corp. v. Newstress Int'l, Inc.*, 2007 VT 83, ¶ 13, 182 Vt. 282, 938 A.2d 1215 (explaining that where "a transaction contains elements of both sales and service, application of the UCC . . . turns on whether the transaction predominantly, or essentially, relates to goods or services" (quotation omitted)). There were no evident services supplied by hauler or purchased by Rathe Salvage. According to the evidence, the sale of scrap metal goods was not only predominant, it was the only element of the parties' transactions.

¶ 38. Rathe Salvage's reliance on *Allied Erecting & Dismantling Co. v. Auto Baling Co.*, 591 N.E.2d 259 (Ohio Ct. App. 1990), is also misplaced. In that case, the appellant scrap handler was contracted to process appellee's junk metal, store it, and procure buyers for it. Despite appellant's assertion that the contract was for the sale of that metal, the court held that it was predominantly a service agreement, noting that "[o]nly when a buyer was found did appellant forward payment to appellee and confirm the sale." *Id.* at 263. Here, in contrast, hauler and the salvage yard agreed in advance on the price to be paid by hauler, not by the mill, before the scrap was delivered to hauler. Rathe Salvage's contention that hauler was retained to procure buyers in return for a percentage or cut over and above the rate per ton agreed to, and the jury's verdict that the salvage yard was a consumer of hauler's services, find no support in the record.

*Affirmed.*