2013 VT 111

**Foti Fuels, Inc. and Robert A. Foti v. Kurrle Corporation, Payjack, LLC and James J. Kurrle**

[90 A.3d 885]

No. 12-195

Present: **Reiber, C.J., Dooley, Skoglund, Burgess and Robinson, JJ.**

Opinion Filed December 13, 2013

Motion for Reargument Denied January 23, 2014

526

*Christopher D. Roy* of *Downs Rachlin Martin PLLC*, Burlington, for Plaintiffs-Appellees.

*L. Brooke Dingledine* of *Valsangiacomo, Detora & McQuesten*, Barre, for Defendants-Appellants.

¶ 1. **Reiber, C.J.** Plaintiff Robert Foti sold most of his fuels business to defendant James Kurrle and agreed to sell gasoline to

defendant through his retained wholesale distributorship. When their business relationship soured after several years, plaintiff sued defendant for one month's nonpayment of gasoline and other claims. Defendant counterclaimed for breach of contract, breach of the covenant of good faith and fair dealing, and violation of the Vermont Consumer Fraud Act (CFA), all arising from his original purchase of plaintiff's business. Defendant now appeals the court's judgments as a matter of law on these counterclaims in favor of plaintiff. We affirm in part and reverse in part.

¶ 2. In 1976, plaintiff began selling and distributing gasoline and other fuels from a facility on Route 2 in Montpelier, Vermont. He formed two corporations to run his business: Foti Fuels, Inc., consisting of an Exxon-branded retail gasoline station, a convenience store, a petroleum bulk storage tank, and a wholesale fuel distributorship supplying retail stations with gasoline; and Foti Fuels Enterprises, Inc., a transportation company that delivered gasoline to other retail stations. In 2000, he offered to sell his business to defendant. Because defendant did not have experience in the fuels industry, the two agreed that plaintiff would train and employ defendant as a manager for several years before executing purchase agreements for the business. Plaintiff expressed that he would move permanently to Arizona after selling his Vermont business, and had already begun to develop a similar business in Tucson.

¶ 3. The parties structured the purchase, which closed on March 1, 2004, pursuant to three agreements. First, an asset-purchase agreement dated November 8, 2003 transferred to defendant nearly all of Foti Fuels' assets, with the primary exception of the wholesale fuel distributorship. Second, a stock-purchase agreement conveyed ownership of Foti Fuels Enterprises, the transportation company, to defendant. Finally, a post-closing agreement outlined the arrangements concerning plaintiff's remaining wholesale fuel distributorship. The post-closing agreement provided that defendant would manage, rent storage space to, and purchase gasoline for his retail station from plaintiff's remaining wholesale distributorship for five years, at which point defendant would have the first opportunity to purchase the distributorship if plaintiff chose to sell it. This way, plaintiff could develop his new business in Arizona while retaining his health insurance through the wholesale distributorship, which had only two customers besides defendant's retail station.

¶ 4. The asset-purchase agreement contained a five-year noncompetition provision for $30,000 in consideration, to be paid in five equal annual installments. The provision prohibited plaintiff from directly or indirectly engaging or taking an interest in "any business which is in competition with the business of [the defendant]" within a ten-mile radius of the acquired operations, whether as an owner, officer, director, employee, or otherwise. The provision similarly barred plaintiff from managing, financing, owning or controlling any interest in a fuels-transportation business in Maine, Vermont, or New Hampshire. Although the asset-purchase agreement indicated that the provision was to survive closing, the parties later executed a separate noncompetition agreement outlining similar, but more specific, terms regarding the prohibited competition. The new agreement prohibited plaintiff from engaging in "any business which is in competition with the business of retail sale of gasoline and/or the operation of a convenience store by [defendant]." The language barring plaintiff's participation in the petroleum-transportation business remained the same in the new agreement. Finally, the new agreement called for the first installment payment on January 1, 2005, one year later than the less-specific noncompetition provision contained in the asset purchase agreement.

¶ 5. Soon after closing, plaintiff's retirement and moving plans were delayed. For several months in 2007 and 2008, plaintiff worked as a salesman and delivery coordinator for Packard Fuels, a retail diesel and home-heating-oil company that delivered its products directly to its customers. Even so, plaintiff appeared to maintain a close business relationship with defendant. Packard would purchase its diesel and home heating oil from plaintiff's wholesale distributorship, which defendant managed, and defendant's transportation company would deliver it to Packard.

¶ 6. The legal dispute between plaintiff and defendant arose from a breakdown of the arrangements established by the five-year post-closing agreement. Coincidentally, this agreement was set to terminate at around the same time that Exxon planned to withdraw from the New England market, which left both plaintiff and defendant scrambling to rebrand their businesses. Before plaintiff could do so, defendant signed an agreement to rebrand with Shell that required him to stop doing business with plaintiff and to purchase gasoline from a competing distributorship, Evans Motor Fuels. At the same time, plaintiff's two remaining custom-

ers also decided to end their business with plaintiff in favor of purchasing gasoline from Evans. Finally, defendant agreed to deliver gasoline to plaintiff's former customers through his transportation company. Left without any customers for his distributorship, plaintiff terminated all business relations with defendant.

¶ 7. Both plaintiff and defendant raised claims arising from the termination of their business relationship. Many of these claims were disposed of before trial, and we now limit our analysis only to those three counterclaims by defendant raised in his appeal.[1] Defendant's counterclaims are for breach of contract and breach of the covenant of good faith and fair dealing — both of which arise from plaintiff's alleged violation of the noncompetition provision through his employment by Packard Fuels — and for consumer fraud, based on plaintiff's allegedly false promises to move to Arizona, to abide by the noncompetition agreement, and to sell the distributorship to defendant within three to five years.

¶ 8. Plaintiff moved for judgment as a matter of law under Vermont Rule of Civil Procedure 50(a) on these counterclaims after the close of evidence. The trial court granted the motion as to the first two counterclaims and concluded that the defendant failed to establish damages. However, after explaining that it needed more time to research whether the CFA covered the fuels business transactions at issue, the court submitted the CFA counterclaim to the jury. The jury awarded $520,000 in actual damages and $2,000,000 in punitive damages to defendant on the CFA claim. The court, however, granted plaintiff's renewed motion for judgment as a matter of law under Rule 50(b) and vacated the damages award, reasoning that the CFA did not, as a matter of statutory interpretation, cover this fuels business transaction because it did not occur "in commerce" as defined in the CFA.

---

[1] The disposed-of claims include plaintiff's claims for: (1) breach of contract for defendant's nonpayment of one month's supply of gasoline, (2) breach of the covenant of good faith and fair dealing for defendant's gross neglect in managing the wholesale-fuel distributorship, (3) breach of the noncompete agreement for defendant's failure to pay the final installment, and (4) breach of fiduciary duty owed by defendant to the fuel distributorship. Defendant's counterclaims for (1) unpaid fees for transporting plaintiff's distributorship's gasoline, (2) intentional or negligent interference with contractual relations for interfering with defendant's opportunity to deliver gasoline for Evans, (3) breach of the post-closing agreement for failing to pay for his management of plaintiff's wholesale distributorship, and (4) breach of the covenant of good faith and fair dealing regarding this management were also disposed of prior to trial.

¶ 9. Defendant appeals the court's order of judgment as a matter of law on the CFA counterclaim, arguing that the court should not have considered plaintiff's motion because plaintiff did not raise the argument that the CFA did not cover the transaction until after trial, and further that the court erred in holding that the transaction was not "in commerce." Defendant also appeals the court's judgment as a matter of law on the breach of contract and breach of the covenant of good faith and fair dealing counterclaims arising from the noncompetition provision.

## I.

¶ 10. We first address defendant's claim that the trial court erred in granting plaintiff's renewed motion for judgment as a matter of law on defendant's CFA claim. We address this argument de novo because the issues it raises are strictly matters of law. *State v. Neisner*, 2010 VT 112, ¶ 11, 189 Vt. 160, 16 A.3d 597. We therefore evaluate it by the same standard that the trial court applied to plaintiff's renewed motion, and consider the evidence "in the light most favorable to the nonmoving party, excluding the effect of modifying evidence." *Vincent v. DeVries*, 2013 VT 34, ¶ 9, 193 Vt. 574, 72 A.3d 886 (quotation omitted). Judgment as a matter of law is appropriate if "there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue." V.R.C.P. 50(a)(1). We will therefore reverse only where "no evidence exists that fairly and reasonably supports the jury's verdict." *Vincent*, 2013 VT 34, ¶ 9. We conclude, as the trial court did, that the CFA does not apply to this transaction as a matter of law. Because there is no legally sufficient evidentiary basis to support the jury's verdict, we affirm.

## A.

¶ 11. ■ As an initial matter, we address defendant's contention that the court improperly considered plaintiff's renewed motion for judgment as a matter of law because, according to defendant, the motion raised a novel issue not presented in plaintiff's original motion under Rule 50(a). A motion for judgment as a matter of law must be made prior to submission of the case to the jury, V.R.C.P. 50(a)(2), and "must specify the judgment sought and the law and facts upon which the moving party relies." *EBWS, LLC v. Britly Corp.*, 2007 VT 37, ¶ 10, 181 Vt. 513, 928 A.2d 497. These requirements of timely filing and specificity place the nonmoving

party on notice of potential evidentiary deficiencies and provide the opportunity to "cure any defects in proof, if possible." *Id.* ¶ 10; see also Advisory Committee Notes, 1991 Amendment, F.R.C.P. 50(a) ("In no event . . . should the court enter judgment against a party who has not been apprised of the materiality of the dispositive fact and been afforded an opportunity to present any available evidence bearing on that fact.").

¶ 12. ▉ If the trial court declines to grant a motion for judgment as a matter of law, the moving party may renew its request after trial. V.R.C.P. 50(b). The grounds for the renewed motion are limited to "those specifically raised in the prior motion." *Samuels v. Air Transp. Local 504*, 992 F.2d 12, 14 (2d Cir. 1993) (discussing analogous federal provision); *Meriwether v. Coughlin*, 879 F.2d 1037, 1044 (2d Cir. 1989) ("Because a [Rule 50(b) motion] is technically a renewal of a motion for a directed verdict, it cannot assert a new ground [for relief]."). The prohibition on raising novel arguments in a Rule 50(b) motion serves the rule's underlying purposes: to permit parties to correct evidentiary shortcomings and to avoid unfair surprise. *Samuels*, 992 F.2d at 14; see also 5A J. Moore et al., Moore's Federal Practice 50-89 (2d ed. 1993) (noting that requiring previous motion and limiting grounds is "in keeping with the spirit of the rules to avoid tactical victories at the expense of substantive interests").

¶ 13. Here, plaintiff's renewed motion did not raise a claim distinct from the consumer fraud claim advanced in its original motion. Even before the end of plaintiff's case in chief, the court expressed its concerns regarding whether the sale of plaintiff's businesses constituted a consumer transaction for the purposes of the CFA. In addressing the issue, the court indicated: "I think that the consumer fraud statute only . . . applies to consumer transactions, broadly speaking. . . . This isn't a consumer transaction." The parties engaged in a brief discussion, during which defendant argued that the transaction fell within the scope of the CFA because plaintiff was engaged in the business of selling businesses and because the transaction involved the transfer of real property. The court specifically noted: "I brought it up because I think it's a valid point to raise and I wanted to get people thinking about it before we got down to the instructions." The court, unwilling to make a ruling without the benefit of additional briefing, urged defendant to provide authority for the proposition that the CFA covered this type of transaction.

¶ 14. The following day, during plaintiff's motion for judgment as a matter of law, the parties again engaged in a lengthy discussion regarding the act's applicability to the transaction. Defendant, in fact, had submitted to the court a brief arguing that the CFA covered the sale of plaintiff's business, emphasizing the broad remedial purpose of the statute and analogizing this case to other covered transactions. Plaintiff responded that defendant failed to present evidence establishing that plaintiff was a "seller" of businesses or that defendant was a "consumer" as required under the statute, and that the comprehensive nature of the agreement obviated any potential claim under the CFA. The court reiterated its concern that defendant had not offered evidence to prove that plaintiff met the statutory definition of a seller and that the transaction was not, therefore, a consumer transaction. The court noted, "[i]t's not really the property, tangible or intangible, that's being transferred that's a hang-up. It's the parties and the nature of the transaction." The court again reserved judgment, stating "I'm thinking at this point we'll be giving it to the jury and giving you folks the chance to brief this further after the verdict if it becomes appropriate." At the court's behest, plaintiff clarified in its renewed motion its position regarding the scope of the CFA.

¶ 15. ■ It is beyond question that defendant was on notice of the precise nature of plaintiff's argument and, indeed, the court's concerns with respect to the act's applicability to a private business transaction. Accordingly, plaintiff's argument in the renewed motion for judgment as a matter of law was not new, but rather a fuller explanation of the argument presented in plaintiff's original motion. Considered in this light, defendant had ample opportunity to respond to plaintiff's argument. *EBWS*, 2007 VT 37, ¶ 10.

### B.

¶ 16. We now turn to the substance of defendant's argument, that the trial court erred in refusing to apply the CFA to the transaction at issue. In granting plaintiff's renewed motion for judgment as a matter of law, the trial court held that there was no sufficient evidentiary basis for the jury to find that the transaction occurred "in commerce," as defined by the CFA.

¶ 17. ■ A party violates the CFA if he or she engages in an unfair or deceptive act or practice in commerce. See *Christie v*

*Dalmig, Inc.*, 136 Vt. 597, 600, 396 A.2d 1385, 1387 (1979). Both the Attorney General and injured private parties may prosecute violations of the CFA. Private parties are encouraged to prosecute CFA violations by the act's provision allowing treble damages and attorney's fees, but they must meet additional standing requirements. Specifically, the private party must be a consumer who was harmed by the unfair or deceptive act or practice. 9 V.S.A. § 2461(b).

¶ 18.  The Legislature passed the CFA as a complement to federal law to promote honest competition and to protect the public. See 9 V.S.A. § 2451. Indeed, the operative language of the Vermont CFA and § 5 of the Federal Trade Commission Act (FTCA) are nearly identical. Compare 9 V.S.A. § 2453(a) ("Unfair methods of competition in commerce, and unfair or deceptive acts or practices in commerce, are hereby declared unlawful.") with 15 U.S.C. § 45(a)(1) ("Unfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce, are hereby declared unlawful."). The Vermont Legislature expressly instructed the courts to construe the CFA to parallel the construction of § 5 of the FTCA. See 9 V.S.A. § 2453(b) ("[I]n construing subsection (a) of this section, the courts of this State will be guided by the construction of similar terms contained in Section 5(a)(1) of the Federal Trade Commission Act as from time to time amended by the Federal Trade Commission and the courts of the United States.").

¶ 19. In the case at hand, we must interpret the act's central provision: the prohibition of unfair or deceptive acts or practices that occur "in commerce." *Sawyer v. Robson*, 2006 VT 136, ¶ 11, 181 Vt. 216, 915 A.2d 1298. The CFA does not define "in commerce," and our case law interpreting the term is limited. See *Carter v. Gugliuzzi*, 168 Vt. 48, 54, 716 A.2d 17, 22 (1998) (determining that the ordinary meaning of "in commerce" "obviously applies" to broker that sold real estate throughout Chittenden County); *Wilder v. Aetna Life & Cas. Ins. Co.*, 140 Vt. 16, 18, 433 A.2d 309, 310 (1981) (noting that "[t]he business of insurance is clearly within commerce"). In *Sawyer*, we noted that the "scope of potential plaintiffs and defendants under the CFA was deliberately broadened over time." 2006 VT 136, ¶ 11 n.7. Although the CFA originally permitted only the Attorney General to enforce its provisions, the Act was amended to permit private causes of action by individual consumers. *Id.* Later, the language

was further broadened to expand the possible range of defendants from "sellers" and "solicitors" to include "other violators." *Id.*; see also 9 V.S.A. § 2461(b). Nevertheless, the fact that the Legislature created broad categories of potential plaintiffs and defendants does not eliminate the threshold inquiry of whether the transaction was "in commerce" — a question we intentionally avoided deciding in *Sawyer. Id.* ¶ 10 n.6. Here, we must decide whether the transactions at issue were "in commerce" for the purpose of defendant's CFA counterclaim.

¶ 20. Courts in states with similar statutes have found that the "in commerce" requirement narrows the statute's applicability. The Massachusetts Consumer Protection Act, for example, broadly defines its equivalent of the "in commerce" requirement to include any trade or commerce directly or indirectly affecting the people of the state. Mass. Gen. Laws ch. 93A, § 1. Reading the statute as a whole, however, the state's highest court has held that "in commerce" necessarily limits the act's application to the "business context." *Lantner v. Carson*, 373 N.E.2d 973, 977 (Mass. 1978). The "in commerce" language, in particular, limits the act's application to the consumer context. *Commonwealth v. DeCotis*, 316 N.E.2d 748, 752 (Mass. 1974) (holding that act's purpose is to provide "a more equitable balance in the relationship of consumers to persons conducting business activities"). Similarly, the New Hampshire Consumer Protection Act broadly defines its equivalent of the "in commerce" requirement. N.H. Rev. Stat. Ann. § 358-A:1. Nevertheless, the state's highest court has determined that the act's scope "is narrower than its broad language may suggest." *Ellis v. Candia Trailers & Snow Equip., Inc.*, 58 A.3d 1164, 1171 (N.H. 2012). In particular, the court has held that "[r]emedies under the Consumer Protection Act are not available where the transaction is strictly private in nature . . . [as] [t]he purpose of the Act is to ensure an equitable relationship between consumers and persons engaged in business." *Hughes v. DiSalvo*, 729 A.2d 422, 424 (N.H. 1999) (quotations omitted). The Massachusetts and New Hampshire holdings echo other state courts. See *Zeeman v. Black*, 273 S.E.2d 910, 913 (Ga. Ct. App. 1980) (holding that state consumer fraud act covers only wrongs committed in context of public consumer marketplace); *Nelson v. Lusterstone Surfacing Co.*, 605 N.W.2d 136, 141 (Neb. 2000) (holding that state consumer fraud statute prohibits acts or practices that affect public interest).

¶ 21. ■ ■ For similar reasons, we hold that the "in commerce" requirement narrows the CFA's application to prohibit only unfair or deceptive acts or practices that occur in the consumer marketplace. To be considered "in commerce," the transaction must take place "in the context of [an] ongoing business in which the defendant holds himself out to the public." *Zeeman*, 273 S.E.2d at 915. Further, the practice must have a potential harmful effect on the consuming public, and thus constitute a breach of a duty owed to consumers in general. *Id.* By contrast, transactions resulting not from "the conduct of any trade or business" but rather from "private negotiations between two individual parties who have countervailing rights and liabilities established under common law principles of contract, tort and property law" remain beyond the purview of the statute. *Id.* (quotation omitted).

¶ 22. ■ This interpretation reinforces the Act's underlying purpose of consumer protection. See *Rathe Salvage, Inc. v. R. Brown & Sons, Inc.*, 2012 VT 18, ¶ 8, 191 Vt. 284, 46 A.3d 891 (requiring plaintiffs to prove that they are consumers to recover under CFA); *Carter*, 168 Vt. at 56, 716 A.2d at 23 (articulating three-element test for "deceptive" acts or practices that emphasizes effects on consumers); *Christie*, 136 Vt. at 601, 396 A.2d at 1388 (quoting *F.T.C. v. Sperry & Hutchinson Co.*, 405 U.S. 233, 244 n.5 (1972)) (adopting United States Supreme Court formulation of FTCA factors emphasizing public policy and injury to consumers to determine whether act is "unfair").

¶ 23. ■ This interpretation of the CFA also comports with the accepted understanding that its federal counterpart, the FTCA, protects consumers in the general public. See 15 U.S.C. § 45(n) ("[T]he Commission shall have no authority under [§ 5 of the FTCA] . . . to declare unlawful an act or practice on the grounds that such act or practice is unfair unless the act or practice causes or is likely to cause substantial injury to consumers . . . ."); *Cal. Apparel Creators v. Wieder of Cal.*, 68 F. Supp. 499, 506 (S.D.N.Y. 1946) ("Where the unfair competition arises out of a controversy essentially private in its nature, the Federal Trade Commission lacks jurisdiction."). Statutory protection of consumers serves an important function because, in certain respects, the consumer marketplace is tilted against buyers in favor of sellers. Individual buyers often hold less bargaining power and knowledge about the products they are purchasing than do sellers, and they face

barriers to pursuing their claims if they are wronged in a transaction. Common law remedies are frequently inadequate for addressing wrongs committed against individual consumers because the costs of litigation often outweigh the rewards. See *Spinner Corp. v. Princeville Dev. Corp.*, 849 F.2d 388, 391 (9th Cir. 1988) (noting that Hawaii's consumer fraud act "is designed to provide encouragement to people whose damages are relatively small by granting to them, if successful, treble damages").

¶ 24. Broadening the scope of the CFA to encompass transactions that do not occur in the consumer marketplace would not serve the CFA's aim of public protection. In purely private transactions, remedies available through well-established principles of contract, tort, and property law are adequate to redress wrongs. Therefore, granting a remedy that benefits only the buyer in a purely private transaction would create an imbalance arbitrarily favoring one party. Cf. *Lantner*, 373 N.E.2d at 977 (when both parties have equal bargaining power, "arming the 'consumer' [with additional legal remedies] . . . does not serve to equalize the positions of buyer and seller. Rather, it serves to give superior rights to only one of the parties, even though as nonprofessionals both stand on an equal footing."). Additionally, expanding the CFA to cover purely private transactions would allow the act to subsume the common law claims traditionally employed to remedy contractual wrongs. See *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 136, 636 A.2d 744, 749 (1993) (cautioning against "confusing principles of contract with principles of fraud so that the elements of fraud are made out by a mere breach of contract").

¶ 25. ■ Here, the parties' transaction does not constitute a transaction "in commerce" for CFA purposes because it did not occur in the consumer marketplace. First, plaintiff held his offer out to defendant only, not to the public at large. See *Zeeman*, 273 S.E.2d at 913-14. Second, the transaction did not involve products, goods or services purchased or sold for general consumption, as those terms are generally understood, but rather the sale of an entire business from one party to another. See *539 Absecon Blvd., L.L.C. v. Shan Enters. Ltd. P'ship*, 967 A.2d 845, 868 (N.J. Super. Ct. App. Div. 2009) (declining to expand scope of consumer fraud statute to include sale of ongoing business from one group of owners to another). Third, the transaction's high level of customization — which was achieved through particularly negotiated contract terms rather than boilerplate language — does not

typically occur in the consumer marketplace. See *Cetel v. Kirwan Fin. Grp., Inc.*, 460 F.3d 494, 514-15 (3d Cir. 2006) (determining that New Jersey Consumer Fraud Act did not cover participation of physician groups in employee welfare benefit plans in part because of plans' customization).

¶ 26. Defendant was free to pursue his claims through the common law remedies available to any party. Because the transaction did not occur "in commerce" as we interpret that phrase in the CFA context, we do not address the CFA's other requirements.

## II.

¶ 27. Finally, defendant contends that the court erred in granting plaintiff judgment as a matter of law on defendant's claims stemming from plaintiff's alleged breach of the noncompetition agreement that accompanied the business sale.[2] We agree that the court should have sent the case to the jury on those grounds and therefore remand.

## A.

¶ 28. Before proceeding, we address which of two separate documents purporting to bar plaintiff from competing with defendant's business governs the analysis. As stated above, the asset-purchase agreement contained a noncompetition provision that, among other things, barred plaintiff from engaging in "any business which is in competition with the business of [the defendant]." A separate noncompetition agreement specified that plaintiff agreed not to compete with defendant's "business of retail sale of gasoline and/or the operation of a convenience store."

¶ 29. ▮▮▮▮ We conclude that the latter agreement governs the contractual relationship between the parties. Parties are generally

---

[2] Plaintiff also argues that the evidence was insufficient as a matter of law for the jury to conclude that plaintiff breached the noncompete agreement. This argument was never raised in either plaintiff's motion for judgment as a matter of law under Rule 50(a), or in its renewed motion under Rule 50(b). Rather, plaintiff explicitly argued that the basis of both motions was the "contention that the [noncompetition provision breach] claim fails because [defendant] has failed to establish damages." Therefore, because this issue was not raised in either of plaintiff's motions for judgment as a matter of law, we do not address this issue on appeal. Likewise, we do not address whether the noncompetition agreement permits apportionment of damages proportional to defendant's loss in the event that the jury finds that plaintiff breached the agreement.

free to alter or amend the terms of their contractual arrangements by mutual assent provided all requirements are met for a valid contract, including adequate consideration. See *Archambo v. Lawyers Title Ins. Corp.*, 646 N.W.2d 170, 176 (Mich. 2002) ("It is hornbook law that parties to a contract are not forever locked into its terms. They are at all times free to alter, amend, or modify their agreement." (quotation omitted)). Moreover, "[i]t is a basic tenet of contract interpretation that specific terms are given greater weight than are general terms." *In re Adelphia Bus. Solutions of Vt., Inc.*, 2004 VT 82, ¶ 15, 177 Vt. 136, 861 A.2d 1078 (citing Restatement (Second) of Contracts § 203(c) (1981)). Here, the stand-alone agreement represented a modification of the terms, defining more specifically the precise scope of the agreement not to compete. Further, the year-long reprieve defendant obtained for the first installment payment constituted adequate consideration for this contract modification. On remand, it is the terms of this stand-alone agreement that must govern the issue.

## B.

¶ 30. We turn now to the substance of defendant's breach of contract and good faith and fair dealing counterclaims. These counterclaims were based on plaintiff's alleged violation of the noncompetition agreement by working for Packard Fuels. Defendant argued that Packard delivered diesel fuel to several of defendant's existing customers and planned to establish a potentially competing retail gasoline station. After the close of evidence, plaintiff moved for judgment as a matter of law, arguing that defendant's counterclaims should not go to the jury because defendant failed to show damages.

¶ 31. The court granted plaintiff's motion. It held that failure to establish lost profits is fatal to a breach of contract claim based upon an alleged violation of a noncompetition agreement. In doing so, the court specifically rejected using consideration as the measure of damages and observed that "other evidence regarding damages from any breach of contract or breach of covenant in good faith is speculative."

¶ 32. ▆▆▆ We reject the court's rationale because a party claiming breach of contract may seek relief based on more than one theory of measurement of damages. Broadly speaking, the correct measure for recovery in breach of contract cases is:

"(a) the loss in the value to [the nonbreaching party] of the other party's performance caused by its failure or deficiency, plus

(b) any other loss, including incidental or consequential loss, caused by the breach, less

(c) any cost or other loss that [the nonbreaching party] has avoided by not having to perform."

*McGee Constr. Co. v. Neshobe Dev. Inc.*, 156 Vt. 550, 557, 594 A.2d 415, 419 (1991) (quoting Restatement (Second) of Contracts § 347); see also *WSP, Inc. v. Wyo. Steel Fabricators & Erectors, Inc.*, 2007 WY 80, ¶ 21, 158 P.3d 651 ("As a type of consequential damages, lost profits are merely one measure of damages.").

¶ 33. Here, defendant claimed consequential damages in the form of lost profits from the loss of three particular customers.[3] It is also clear, however, that defendant sought in the alternative to measure its loss by the value of the noncompetition agreement, as evidenced by the separate consideration assigned to that arrangement. Defendant expressly contended that it paid $30,000 for the noncompetition agreement but received nothing in return.

¶ 34. ▮▮ ▮▮ In order to award consequential damages based on lost profits, the jury must "estimate the amount within reasonable limits based upon the evidence before it." *Lemnah v. Am. Breeders Serv., Inc.*, 144 Vt. 568, 580, 482 A.2d 700, 707 (1984). Difficulty in computing damages does not necessarily preclude the jury from awarding damages if there is "sufficient evidence from which it could have made a reasonable determination of damages." *Id.*; see also *Smith v. Country Village Int'l, Inc.*, 2007 VT 132, ¶ 9, 183 Vt. 535, 944 A.2d 240 (mem.) (rejecting damages recovery where evidence could not establish either direct or consequential damages).[4] In particular, when a plaintiff has

---

[3] Given our conclusion regarding the insufficiency of the evidence to establish consequential damages, we need not address plaintiff's contention that defendant failed to properly plead its claim for these damages. See V.R.C.P. 9(g) ("When items of special damage are claimed, they shall be specifically stated."); see also *Vineyard Brands, Inc. v. Oak Knoll Cellar*, 155 Vt. 473, 483, 587 A.2d 77, 82 (1990) (lost profits are special damages that must be specifically stated).

[4] We recognize that our language in *Smith* was perhaps overbroad and may have led to confusion with respect to the elements necessary to establish a breach of contract as opposed to the evidence necessary to permit the recovery of either

sought consequential damages as a result of a breach of a noncompetition provision, we have stressed that "[t]he measure of damages for breach of a noncompetition agreement is the plaintiff's provable loss and not the gain accruing to the defendant by reason of the breach." *Vt. Elec. Supply Co. v. Andrus*, 135 Vt. 190, 192, 373 A.2d 531, 532 (1977). Moreover, a litigant must establish that consequential damages "pass the tests of causation, certainty and foreseeability, and, in addition, be reasonably supposed to have been in the contemplation of both parties at the time they made the contract." *A. Brown, Inc. v. Vt. Justin Corp.*, 148 Vt. 192, 196, 531 A.2d 899, 902 (1987).

¶ 35. ▮▮▮ In this case, we agree with the trial court that defendant failed to establish consequential damages with the type of specificity that would permit a fact finder to make an appropriate and rational award. See *Ferrisburgh Realty Investors v. Schumacher*, 2010 VT 6, ¶ 26, 187 Vt. 309, 992 A.2d 1042 (noting, in affirming post-verdict judgment for defendant, that "[plaintiff] identifies no evidence in the record whatsoever that would support such a large award of damages" in claim for breach of covenant of good faith and fair dealing).

¶ 36. Defendant alleged that it lost diesel revenue of about $60,000 a year from three former customers: Packard Fuels, J.M. McDonald, and Bolduc Auto Salvage. Defendant also alleged that it suffered a reduction in transportation revenue from home-heating oil of about $80,000 a year, excluding the impact of a

direct or consequential damages as a result of that breach. See 2007 VT 132, ¶ 9 ("To prove breach of contract, plaintiff must show damages."); *id.* ¶ 10 ("Failure to prove damages is fatal to a claim for breach of contract."); see also *Ianelli v. U.S. Bank*, 2010 VT 34, ¶ 16, 187 Vt. 644, 996 A.2d 722 (mem.) (citing *Smith*, 2007 VT 132, ¶ 10) ("If damages are not proven, a breach of contract claim will fail."). Failure to prove damages is fatal not to an action for breach of contract, as it would be for most tort actions, but rather to recovery on the basis of those damages. The overbroad language in *Smith* derived from our holding in *Dufresne-Henry Engineering Corp. v. Gilcris Enterprises, Inc.*, 136 Vt. 274, 388 A.2d 416 (1978). *Dufresne-Henry* dealt with a suit to recover the value of services rendered, an action based on quantum meruit rather than breach of contract, and the failure to adequately establish damages therefore precluded any recovery. *Id.* at 277, 388 A.2d at 419. In *Smith*, we also cited *Donovan v. Towle*, 99 Vt. 464, 472, 134 A. 588, 591 (1926), which was an action for fraud in which, unlike breach of contract, "fraud without damage, or damage without fraud, will not sustain [the] action." 2007 VT 132, ¶ 10. In *Smith*, the real issue, although inartfully framed as a failure to establish damages, was that the alleged breach never occurred because the plaintiff was never entitled to the losses he sought to recover.

potential offset for a brief period. Even assuming that defendant could establish that the lost revenues were caused by a breach, see *A. Brown*, 148 Vt. at 196, 531 A.2d at 902, the jury had "nothing at all to go on" in determining any corresponding loss of profits, as the trial court noted. Absent any understanding of profit margins, the jury would be unable to rationally translate these lost revenues into a reasonable estimate of lost profits. The trial court, therefore, properly declined to submit the claim for consequential damages to the jury.

¶ 37. ■ ■ Nevertheless, defendant's inability to establish consequential damages does not foreclose all remedies for a breach of a noncompetition agreement. Consequential damages are merely one way to determine a remedy in a breach of contract action. Cf. *Tour Costa Rica v. Country Walkers, Inc.*, 171 Vt. 116, 124, 758 A.2d 795, 802 (2000) (discussing range of breach of contract remedies in promissory estoppel case, including expectation damages, restitution, and reliance damages). Restitution, or a refund of the consideration paid, may be available as an alternative measure of damages. See *Morris v. Homco Int'l, Inc.*, 853 F.2d 337, 346 (5th Cir. 1988) (citing Restatement (Second) of Contracts § 373 (1979) in support of "general rule" that "restitution may be had only as an alternative to damages for actual losses resulting from a breach, not in addition to such damages" in noncompetition case based on Louisiana law); see also 1 D. Dobbs, Law of Remedies § 4.1(1), at 552 (2d ed. 1993) ("Restitution is often an appropriate remedy for breach of an enforceable contract, whether or not there is a 'rescission' of that contract."). When awarded to remedy a breach of contract, restitution is an appropriate remedy at law for the unjust enrichment that would occur if a breaching party to the contract were permitted to retain the benefit of the plaintiff's performance. *Tour Costa Rica*, 171 Vt. at 124, 758 A.2d at 802; see also Restatement (Second) of Contracts § 373(1) (1981) ("[O]n a breach by non-performance . . . the injured party is entitled to restitution for any benefit that he has conferred on the other party by way of part performance or reliance.").[5] Indeed, such a measure of the loss suffered by a

---

[5] The Restatement (Second) of Contracts limits the availability of contractual restitution damages of this type by expressly excluding situations in which the injured party "has performed all of his duties under the contract *and* no performance by the other party remains due *other than* payment of a definite sum

plaintiff may be the most appropriate where consequential damages, such as lost profits, are speculative and thus difficult to establish.

¶ 38. ▆ We hold that defendant is entitled to claim the return of the consideration as an alternative form of contractual relief if the jury concludes that plaintiff breached the terms of the noncompetition agreement. In light of the potential remedy of the consideration refund, we hold that the trial court erred in granting plaintiff's motion for judgment as a matter of law on defendant's claims arising from the noncompetition agreement and therefore reverse and remand on this issue.

*Affirmed as to defendant's counterclaim under the Vermont Consumer Fraud Act; reversed and remanded with respect to the trial court's grant of judgment as a matter of law on defendant's counterclaims for breach of contract and breach of the covenant of good faith and fair dealing.*

of money for that performance." § 373(2) (emphasis added). This limitation does not apply to this case because plaintiff's performance due under the noncompete agreement was not a payment but rather fulfillment of his promise to not compete.