2013 VT 111




Foti Fuels, Inc. and Robert A.
Foti v. Kurrle Corporation, Payjack, LLC and James J. Kurrle (2012-195)


 


2013 VT 111


 


[Filed 13-Dec-2013]


 


NOTICE:  This opinion is
subject to motions for reargument under V.R.A.P. 40 as well as formal revision
before publication in the Vermont Reports.  Readers are requested to
notify the Reporter of Decisions by email at: JUD.Reporter@state.vt.us or by
mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont
05609-0801, of any errors in order that corrections may be made before this
opinion goes to press.


 


 



 
 2013 VT 111

 

  



 
 No. 2012-195

 

  



 
 Foti Fuels, Inc. and Robert A.
 Foti

 

 
 
 Supreme Court

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
 On Appeal from

 

 
 
      v.

 

 
 
 Superior Court, Washington
 Unit,

 

 
 
  

 

 
 
 Civil Division

 

 
 
  

 

 
 
  

 

 
 
 Kurrle Corporation, Payjack, LLC
 and 

 
 James J. Kurrle

 

 
 
 January Term, 2013

 

 
 
  

 

 
 
  

 

 
 
  

 
 Geoffrey W. Crawford, J.
 (motions for summary judgment)

 
 Michael S. Kupersmith, J.
 (final judgment)

 

 
 
  

 

 Christopher D. Roy of Downs Rachlin Martin PLLC, Burlington,
for Plaintiffs-Appellees.


 


L. Brooke Dingledine of Valsangiacomo, Detora &
McQuesten, Barre, for 


  Defendants-Appellants.


 


 


PRESENT:  Reiber, C.J., Dooley, Skoglund, Burgess and
Robinson, JJ.


 


 


¶ 1.          
REIBER, C.J.   Plaintiff Robert Foti sold most of his
fuels business to defendant James Kurrle and agreed to sell gasoline to
defendant through his retained wholesale distributorship.  When their
business relationship soured after several years, plaintiff sued defendant for
one month’s nonpayment of gasoline and other claims.  Defendant
counterclaimed for breach of contract, breach of the covenant of good faith and
fair dealing, and violation of the Vermont Consumer Fraud Act (CFA), all arising
from his original purchase of plaintiff’s business.  Defendant now appeals
the court’s judgments as a matter of law on these counterclaims in favor of
plaintiff.  We affirm in part and reverse in part.


¶ 2.          
In 1976, plaintiff began selling and distributing gasoline and other
fuels from a facility on Route 2 in Montpelier, Vermont.  He formed two
corporations to run his business: Foti Fuels, Inc.,
consisting of an Exxon-branded retail gasoline station, a convenience store, a
petroleum bulk storage tank, and a wholesale fuel distributorship supplying
retail stations with gasoline; and Foti Fuels
Enterprises, Inc., a transportation company that delivered gasoline to other
retail stations.  In 2000, he offered to sell his business to defendant. 
Because defendant did not have experience in the fuels industry, the two agreed
that plaintiff would train and employ defendant as a manager for several years
before executing purchase agreements for the business.  Plaintiff
expressed that he would move permanently to Arizona after selling his Vermont
business, and had already begun to develop a similar business in Tucson.  


¶ 3.          
The parties structured the purchase, which closed on March 1, 2004,
pursuant to three agreements.  First, an asset-purchase agreement dated
November 8, 2003 transferred to defendant nearly all of Foti Fuels’ assets,
with the primary exception of the wholesale fuel distributorship.  Second,
a stock-purchase agreement conveyed ownership of Foti Fuels Enterprises, the
transportation company, to defendant.  Finally, a post-closing agreement
outlined the arrangements concerning plaintiff’s remaining wholesale fuel
distributorship.  The post-closing agreement provided that defendant would
manage, rent storage space to, and purchase gasoline for his retail station
from plaintiff’s remaining wholesale distributorship for five years, at which
point defendant would have the first opportunity to purchase the
distributorship if plaintiff chose to sell it.  This way, plaintiff could
develop his new business in Arizona while retaining his health insurance
through the wholesale distributorship, which had only two customers besides
defendant’s retail station.  


¶ 4.          
The asset-purchase agreement contained a five-year non-competition
provision for $30,000 in consideration, to be paid in five equal annual
installments.  The provision prohibited plaintiff from directly or
indirectly engaging or taking an interest in “any business which is in
competition with the business of [the defendant]” within a ten-mile radius of
the acquired operations, whether as an owner, officer, director, employee, or
otherwise.  The provision similarly barred plaintiff from managing,
financing, owning or controlling any interest in a fuels-transportation business
in Maine, Vermont, or New Hampshire.  Although the asset-purchase
agreement indicated that the provision was to survive closing, the parties
later executed a separate non-competition agreement outlining similar, but more
specific, terms regarding the prohibited competition.  The new agreement
prohibited plaintiff from engaging in “any business which is in competition
with the business of retail sale of gasoline and/or the operation of a
convenience store by [defendant].”  The language barring plaintiff’s
participation in the petroleum-transportation business remained the same in the
new agreement.  Finally, the new agreement called for the first
installment payment on January 1, 2005, one year later than the less-specific
non-competition provision contained in the asset purchase
agreement.   


¶ 5.          
Soon after closing, plaintiff’s retirement and moving plans were
delayed.  For several months in 2007 and 2008, plaintiff worked as a
salesman and delivery coordinator for Packard Fuels, a retail diesel and
home-heating-oil company that delivered its products directly to its
customers.  Even so, plaintiff appeared to maintain a close business
relationship with defendant.  Packard would purchase its diesel and home
heating oil from plaintiff’s wholesale distributorship, which defendant
managed, and defendant’s transportation company would deliver it to
Packard.  


¶ 6.          
The legal dispute between plaintiff and defendant arose from a breakdown
of the arrangements established by the five-year post-closing agreement. 
Coincidentally, this agreement was set to terminate at around the same time
that Exxon planned to withdraw from the New England market, which left both
plaintiff and defendant scrambling to rebrand their businesses.  Before
plaintiff could do so, defendant signed an agreement to rebrand with Shell that
required him to stop doing business with plaintiff and to purchase gasoline
from a competing distributorship, Evans Motor Fuels.  At the same time,
plaintiff’s two remaining customers also decided to end their business with
plaintiff in favor of purchasing gasoline from Evans.  Finally, defendant
agreed to deliver gasoline to plaintiff’s former customers through his
transportation company.  Left without any customers for his distributorship,
plaintiff terminated all business relations with defendant.  


¶ 7.          
Both plaintiff and defendant raised claims arising from the termination
of their business relationship.  Many of these claims were disposed of
before trial, and we now limit our analysis only to those three counterclaims
by defendant raised in his appeal.[1] 
Defendant’s counterclaims are for breach of contract and breach of the covenant
of good faith and fair dealing¾both of
which arise from plaintiff’s alleged violation of the non-competition provision
through his employment by Packard Fuels¾and
for consumer fraud, based on plaintiff’s allegedly false promises to move to
Arizona, to abide by the non-competition agreement, and to sell the
distributorship to defendant within three to five years.    


¶ 8.          
Plaintiff moved for judgment as a matter of law under Vermont Rule of
Civil Procedure 50(a) on these counterclaims after the close of evidence.
 The trial court granted the motion as to the first two counterclaims and
concluded that the defendant failed to establish damages.  However, after
explaining that it needed more time to research whether the CFA covered the
fuels business transactions at issue, the court submitted the CFA counterclaim
to the jury.  The jury awarded $520,000 in actual damages and $2,000,000
in punitive damages to defendant on the CFA claim.  The court, however,
granted plaintiff’s renewed motion for judgment as a matter of law under Rule 50(b)
and vacated the damages award, reasoning that the CFA did not, as a matter of
statutory interpretation, cover this fuels business transaction because it did
not occur “in commerce” as defined in the CFA.    


¶ 9.          
Defendant appeals the court’s order of judgment as a matter of law on
the CFA counterclaim, arguing that the court should not have considered
plaintiff’s motion because plaintiff did not raise the argument that the CFA
did not cover the transaction until after trial, and further that the court
erred in holding that the transaction was not “in commerce.”  Defendant
also appeals the court’s judgment as a matter of law on the breach of contract
and breach of the covenant of good faith and fair dealing counterclaims arising
from the non-competition provision.


I.


¶ 10.      
We first address defendant’s
claim that the trial court erred in granting plaintiff’s renewed motion for
judgment as a matter of law on defendant’s CFA claim.  We address
this argument de novo because the issues it raises are strictly matters of
law.  State v. Neisner, 2010 VT 112, ¶ 11, 189 Vt. 160, 16 A.3d
597.  We therefore evaluate it by the same standard that the trial court
applied to plaintiff’s renewed motion, and consider the evidence “in the light
most favorable to the nonmoving party, excluding the effect of modifying
evidence.”  Vincent v. DeVries, 2013 VT 34, ¶ 9, ___ Vt. ___,
72 A.3d 886 (quotation omitted).  Judgment as a matter of law is
appropriate if “there is no legally sufficient evidentiary basis for a
reasonable jury to find for that party on that issue.”  V.R.C.P.
50(a)(1).  We will therefore reverse only where “no evidence exists that
fairly and reasonably supports the jury’s verdict.”  Vincent, 2013
VT 34, ¶ 9.  We conclude, as the trial court did, that the CFA does
not apply to this transaction as a matter of law.  Because there is no
legally sufficient evidentiary basis to support the jury’s verdict, we
affirm.  


A.


¶ 11.      
As an initial matter, we address defendant’s contention that the court
improperly considered plaintiff’s renewed motion for judgment as a matter of
law because, according to defendant, the motion raised a novel issue not
presented in plaintiff’s original motion under Rule 50(a).  A motion for
judgment as a matter of law must be made prior to submission of the case to the
jury, V.R.C.P. 50(a)(2), and “must specify the judgment sought and the law and
facts upon which the moving party relies.”  EBWS, LLC v. Britly Corp.,
2007 VT 37, ¶ 10, 181 Vt. 513, 928 A.2d 497.  These requirements of
timely filing and specificity place the nonmoving party on notice of potential
evidentiary deficiencies and provide the opportunity to “cure any defects in
proof, if possible.”  Id. ¶ 10; see also Advisory Committee
Notes, 1991 Amendment, F.R.C.P. 50(a) (“In no event . . . should the
court enter judgment against a party who has not been apprised of the
materiality of the dispositive fact and been afforded an opportunity to present
any available evidence bearing on that fact.”). 


¶ 12.      
If the trial court declines to grant a motion for judgment as a matter
of law, the moving party may renew its request after trial.  V.R.C.P.
50(b).  The grounds for the renewed motion are limited to “those
specifically raised in the prior motion.”  Samuels v. Air Transp. Local
504, 992 F.2d 12, 14 (2d Cir. 1993) (discussing analogous federal
provision); Meriwether v. Coughlin, 879 F.2d 1037, 1044 (2d Cir. 1989) (“Because a [Rule 50(b) motion] is technically a renewal of
a motion for a directed verdict, it cannot assert a new ground [for relief].”). 
The prohibition on raising novel arguments in a Rule 50(b) motion serves the
rule’s underlying purposes: to permit parties to correct evidentiary
shortcomings and to avoid unfair surprise.  Samuels, 992 F.2d at
14; see also 5A J. Moore et al, Moore’s Federal Practice 50-89 (2d ed.
1993) (noting that requiring previous motion and limiting grounds is “in
keeping with the spirit of the rules to avoid tactical victories at the expense
of substantive interests”).  


¶ 13.      
Here, plaintiff’s renewed motion did not raise a claim distinct from the
consumer fraud claim advanced in its original motion.  Even before the end
of plaintiff’s case in chief, the court expressed its concerns regarding
whether the sale of plaintiff’s businesses constituted a consumer transaction
for the purposes of the CFA.  In addressing the issue, the court
indicated: “I think that the consumer fraud statute
only . . . applies to consumer transactions, broadly
speaking. . . . This isn’t a consumer transaction.”
 The parties engaged in a brief discussion, during which defendant argued
that the transaction fell within the scope of the CFA because plaintiff was
engaged in the business of selling businesses and because the transaction
involved the transfer of real property.  The court specifically noted: “I
brought it up because I think it’s a valid point to raise and I wanted to get
people thinking about it before we got down to the instructions.”  The
court, unwilling to make a ruling without the benefit of additional briefing,
urged defendant to provide authority for the proposition that the CFA covered
this type of transaction.    


¶ 14.      
The following day, during plaintiff’s motion for judgment as a matter of
law, the parties again engaged in a lengthy discussion regarding the act’s
applicability to the transaction.  Defendant, in fact, had submitted to
the court a brief arguing that the CFA covered the sale of plaintiff’s
business, emphasizing the broad remedial purpose of the statute and analogizing
this case to other covered transactions.  Plaintiff responded that
defendant failed to present evidence establishing that plaintiff was a “seller”
of businesses or that defendant was a “consumer” as required under the statute,
and that the comprehensive nature of the agreement obviated any potential claim
under the CFA.  The court reiterated its concern that defendant had
not offered evidence to prove that plaintiff met the statutory definition of a
seller and that the transaction was not, therefore, a consumer
transaction.  The court noted, “[i]t’s not really the property, tangible
or intangible, that’s being transferred that’s a hang-up.  It’s the
parties and the nature of the transaction.”  The court again reserved
judgment, stating “I’m thinking at this point we’ll be giving it to the jury
and giving you folks the chance to brief this further after the verdict if it
becomes appropriate.”  At the court’s behest, plaintiff clarified in its
renewed motion its position regarding the scope of the CFA.  


¶ 15.      
It is beyond question that defendant was on notice of the precise nature
of plaintiff’s argument and, indeed, the court’s concerns with respect to the
act’s applicability to a private business transaction.  Accordingly,
plaintiff’s argument in the renewed motion for judgment as a matter of law was
not new, but rather a fuller explanation of the argument presented in
plaintiff’s original motion.  Considered in this light, defendant had
ample opportunity to respond to plaintiff’s argument.  EBWS, 2007
VT 37, ¶ 10.


B.


¶ 16.      
We now turn to the substance
of defendant’s argument, that the trial court erred in refusing to apply the
CFA to the transaction at issue.  In granting plaintiff’s renewed motion
for judgment as a matter of law, the trial court held that there was no
sufficient evidentiary basis for the jury to find that the transaction occurred
“in commerce,” as defined by the CFA.


¶ 17.      
A party violates the CFA if
he or she engages in an unfair or deceptive act or practice in commerce. 
See Christie v. Dalmig, Inc., 136 Vt. 597, 600, 396 A.2d 1385,
1387 (1979).  Both the Attorney
General and injured private parties may prosecute violations of the CFA. 
Private parties are encouraged to prosecute CFA violations by the act’s
provision allowing treble damages and attorney’s fees, but they must meet
additional standing requirements.  Specifically, the private party must be
a consumer who was harmed by the unfair or deceptive act or practice.  9
V.S.A. § 2461(b). 


¶ 18.      
The Legislature passed the
CFA as a complement to federal law to promote honest competition and to protect
the public.  See 9 V.S.A. § 2451.  Indeed, the operative
language of the Vermont CFA and Section 5 of the Federal Trade Commission Act
(FTCA) are nearly identical.  Compare 9 V.S.A. § 2453(a) (“Unfair
methods of competition in commerce, and unfair or deceptive acts or practices
in commerce, are hereby declared unlawful.”) with 15 U.S.C. § 45(a)(1)
(“Unfair methods of competition in or affecting commerce, and unfair or
deceptive acts or practices in or affecting commerce, are hereby declared
unlawful.”).  The Vermont Legislature expressly instructed the courts to
construe the CFA to parallel the construction of Section 5 of the FTCA. 
See 9 V.S.A. § 2453(b) (“[I]n construing subsection (a) of this section, the
courts of this state will be guided by the construction of similar terms
contained in Section 5(a)(1) of the Federal Trade Commission Act as from time
to time amended by the Federal Trade Commission and the courts of the United
States.”). 


¶ 19.      
 In the case at hand, we must interpret the act’s central
provision: the prohibition of unfair or deceptive acts or practices that occur
“in commerce.”  Sawyer v. Robson, 2006 VT 136, ¶ 11, 181 Vt. 216, 915 A.2d 1298.  The CFA does not define “in commerce,” and our case law interpreting the
term is limited.  See Carter v. Gugliuzzi, 168 Vt. 48, 54,
716 A.2d 17, 22 (1998) (determining that the ordinary meaning of “in commerce” “obviously applies” to broker that sold
real estate throughout Chittenden County); Wilder v. Aetna Life & Cas. Ins. Co., 140 Vt. 16, 18,
433 A.2d 309, 310 (1981) (noting
that “[t]he business of insurance is
clearly within commerce”).  In Sawyer, we noted that the “scope of
potential plaintiffs and defendants under the CFA was deliberately broadened over time.”  2006 VT 136,
¶ 11 n.7.  Although the CFA originally permitted only the Attorney
General to enforce its provisions, the Act was amended to permit private causes
of action by individual consumers.  Id.  Later, the language
was further broadened to expand the possible range of defendants from “sellers”
and “solicitors” to include “other violators.”  Id.; see also 9 V.S.A. § 2461(b).  Nevertheless, the fact that the Legislature created
broad categories of potential plaintiffs and defendants does not eliminate the
threshold inquiry of whether the transaction was “in commerce”¾a
question we intentionally avoided deciding in Sawyer.  Id.
¶ 10 n. 6.  Here, we must decide whether the transactions at issue
were “in commerce” for the purpose of defendant’s CFA counterclaim. 


¶ 20.      
Courts in states with similar
statutes have found that the “in commerce” requirement narrows the statute’s
applicability.  The Massachusetts Consumer Protection Act, for example,
broadly defines its equivalent of the “in commerce” requirement to include any
trade or commerce directly or indirectly affecting the people of the state. 
Mass. Gen. Laws ch. 93A, § 1.  Reading the statute as a whole, however, the state’s highest court has held
that “in commerce” necessarily limits the act’s application to the “business
context.”  Lantner v. Carson, 373 N.E.2d 973, 977 (Mass.
1978).  The “in commerce”
language, in particular, limits the act’s application to the consumer
context.  Commonwealth. v. DeCotis, 316 N.E.2d 748, 752
(Mass. 1974) (holding that act’s purpose is to provide “a more equitable
balance in the relationship of consumers to persons conducting business
activities”).  Similarly, the
New Hampshire Consumer Protection Act broadly defines its equivalent of the “in
commerce” requirement. 
N.H. Rev. Stat. Ann. § 358-A:1.  Nevertheless, the state’s highest court has determined that the act’s scope
“is narrower than its broad language may suggest.”  Ellis v. Candia
Trailers & Snow Equip., Inc., 58 A.3d 1164, 1171 (N.H. 2012).  In particular, the court has held
that “[r]emedies under the Consumer Protection Act are not available where the
transaction is strictly private in nature . . . [as] the purpose
of the Act is to ensure an equitable relationship between consumers and persons
engaged in business.”  Hughes v. DiSalvo, 729 A.2d 422, 424 (N.H.
1999) (quotations omitted).  The Massachusetts and New Hampshire holdings
echo other state courts.  See Zeeman v. Black, 273 S.E.2d 910, 913
(Ga. Ct. App. 1980) (holding that state consumer fraud act covers only wrongs
committed in context of public consumer marketplace); Nelson v.
Lusterstone Surfacing Co., 605 N.W.2d 136, 141 (Neb. 2000) (holding that
state consumer fraud statute prohibits acts or practices that affect public
interest).


¶ 21.      
For similar reasons, we hold that the “in commerce” requirement narrows
the CFA’s application to prohibit only unfair or deceptive acts or practices
that occur in the consumer marketplace.  To be considered “in commerce,”
the transaction must take place “in the context of [an] ongoing business in
which the defendant holds himself out to the public.”  Zeeman, 273
S.E.2d at 915.  Further, the practice must have a potential harmful effect
on the consuming public, and thus constitute a breach of a duty owed to
consumers in general.  Id.  By contrast, transactions
resulting not from “the conduct of any trade or business” but rather from
“private negotiations between two individual parties who have countervailing
rights and liabilities established under common law principles of contract,
tort and property law” remain beyond the purview of the statute.  Id.
(quotation omitted). 


¶ 22.      
This interpretation reinforces the Act’s underlying purpose of consumer
protection.  See Rathe Salvage, Inc. v. R. Brown & Sons, Inc.,
2012 VT 18, ¶ 8, 191 Vt. 284, 46 A.3d 891 (requiring plaintiffs to prove that
they are consumers to recover under CFA); Carter, 168 Vt. at 56, 716
A.2d at 23 (articulating three-element test for “deceptive” acts or practices
that emphasizes effects on consumers); Christie, 136 Vt. at 601, 396
A.2d at 1388 (quoting F.T.C. v. Sperry & Hutchinson Co., 405 U.S.
233, 244 n.5 (1972)) (adopting United States Supreme Court formulation of FTCA
factors emphasizing public policy and injury to consumers to determine whether
act is “unfair”).   


¶ 23.      
This interpretation of the CFA also comports with the accepted
understanding that its federal counterpart, the FTCA, protects consumers in the
general public.  See 15 U.S.C. § 45(n) (“[T]he Commission shall have
no authority under [Section 5 of the FTCA] . . . to declare
unlawful an act or practice on the grounds that such act or practice is unfair
unless the act or practice causes or is likely to cause substantial injury to
consumers . . . .”); Cal. Apparel Creators v. Wieder
of Cal., 68 F. Supp. 499, 506 (S.D.N.Y. 1946) (“Where
the unfair competition arises out of a controversy essentially private in its
nature, the Federal Trade Commission lacks jurisdiction.”). 
Statutory protection of consumers
serves an important function because, in certain respects, the consumer
marketplace is tilted against buyers in favor of sellers. 
Individual buyers often hold less
bargaining power and knowledge about the products they are purchasing than do
sellers, and they face barriers to pursuing their claims if they are wronged in
a transaction.  Common law remedies are frequently inadequate for
addressing wrongs committed against individual consumers because the costs of litigation often outweigh the
rewards.  See Spinner Corp. v. Princeville Dev. Corp., 849
F.2d 388, 391 (9th Cir. 1988) (noting that Hawaii’s consumer fraud act “is
designed to provide encouragement to people whose damages are relatively small
by granting to them, if successful, treble damages”).  


¶ 24.      
Broadening the scope of the CFA to encompass transactions that do not
occur in the consumer marketplace would not serve the CFA’s aim of public
protection.  In purely private transactions, remedies available through well-established principles of contract, tort,
and property law are adequate to redress wrongs.  Therefore, granting a remedy that benefits
only the buyer in a purely private transaction would create an imbalance arbitrarily favoring one party.  Cf. Lantner,
373 N.E.2d at 977 (when both parties have equal bargaining power, “arming the
‘consumer’ [with additional legal remedies] . . . does not serve
to equalize the positions of buyer and seller.  Rather, it serves to give
superior rights to only one of the parties, even though as nonprofessionals
both stand on an equal footing.”).
 Additionally, expanding the CFA to cover purely private transactions
would allow the act to subsume the common law claims traditionally employed to
remedy contractual wrongs.  See Winey v. William E. Dailey, Inc.,
161 Vt. 129, 136, 636 A.2d 744, 749 (1993) (cautioning against “confusing
principles of contract with principles of fraud so that the elements of fraud
are made out by a mere breach of contract”).


¶ 25.      
Here, the parties’ transaction does not constitute a transaction “in
commerce” for CFA purposes because it did not occur in the consumer
marketplace.  First, plaintiff
held his offer out to defendant only, not to the public at large.  See Zeeman,
273 S.E.2d at 913-14.  Second, the transaction did not involve products,
goods or services purchased or sold for general consumption, as those terms are
generally understood, but rather the sale of an entire business from one party
to another.  See 539 Absecon Blvd., L.L.C. v. Shan Enters. Ltd.
P’ship, 967 A.2d 845, 868 (N.J. Super. Ct. App. Div. 2009) (declining to
expand scope of consumer fraud statute to include sale of ongoing business from
one group of owners to another).  Third, the transaction’s high level of customization—which was achieved
through particularly negotiated contract terms rather than boilerplate
language—does not typically occur in the consumer marketplace.  See
Cetel v. Kirwan Fin. Grp., Inc., 460 F.3d 494, 514-15 (3d Cir. 2006)
(determining that New Jersey Consumer Fraud Act did not cover participation of physician groups in employee welfare
benefit plans in part because of plans’ customization). 


¶ 26.      
Defendant was free to pursue
his claims through the common law remedies available to any party. 
Because the transaction did not occur “in commerce” as we interpret that phrase
in the CFA context, we do not address the CFA’s other requirements.


II.


¶ 27.      
Finally, defendant contends that the court erred in granting plaintiff
judgment as a matter of law on defendant’s claims stemming from plaintiff’s
alleged breach of the non-competition agreement that accompanied the business
sale.[2] 
We agree that the court should have sent the case to the jury on those grounds
and therefore remand.  


A.


¶ 28.      
Before proceeding, we address which of two separate documents purporting
to bar plaintiff from competing with defendant’s business governs the
analysis.  As stated above, the asset-purchase agreement contained a
non-competition provision that, among other things, barred defendant from
engaging in “any business which is in competition with the business of [the
defendant].”  A separate non-competition agreement specified that plaintiff
agreed not to compete with defendant’s “business of retail sale of gasoline
and/or the operation of a convenience store.”


¶ 29.      
We conclude that the latter agreement governs the contractual
relationship between the parties.  Parties are generally free to alter or
amend the terms of their contractual arrangements by mutual assent provided all
requirements are met for a valid contract, including adequate
consideration.  See Archambo v. Lawyers Title Ins. Corp., 646
N.W.2d 170, 176 (Mich. 2000) (“It is hornbook law that parties to a contract
are not forever locked into its terms. They are at all times free to alter,
amend, or modify their agreement.” (quotation omitted)).  Moreover, “[i]t
is a basic tenet of contract interpretation
that specific terms are given greater weight than are general terms.”  In
re Adelphia Bus. Solutions of Vt., Inc., 2004 VT 82, ¶ 15, 177 Vt.
136, 861 A.2d 1078 (citing Restatement (Second) of Contracts § 203(c) (1981)).
 Here, the stand-alone agreement represented a modification of the terms,
defining more specifically the precise scope of the agreement not to compete.
 Further, the year-long reprieve defendant obtained for the first
installment payment constituted adequate consideration for this contract
modification.  On remand, it is the terms of this stand-alone agreement
that must govern the issue.   


B.


¶ 30.      
We turn now to the substance of defendant’s breach of contract and good
faith and fair dealing counterclaims.  These counterclaims were based on
plaintiff’s alleged violation of the non-competition agreement by working for
Packard Fuels.  Defendant argued that Packard delivered diesel fuel to
several of defendant’s existing customers and planned to establish a
potentially competing retail gasoline station.  After the close of evidence,
plaintiff moved for judgment as a matter of law, arguing that defendant’s
counterclaims should not go to the jury because defendant failed to show
damages.


¶ 31.      
The court granted plaintiff’s motion.  It held that failure to
establish lost profits is fatal to a breach of contract claim based upon an
alleged violation of a non-competition agreement.  In doing so, the court
specifically rejected using consideration as the measure of damages and
observed that “other evidence regarding damages from any breach of contract or
breach of covenant in good faith is speculative.”  


¶ 32.      
We reject the court’s rationale because a party claiming breach of
contract may seek relief based on more than one theory of measurement of
damages.  Broadly speaking, the correct measure for recovery in breach of
contract cases is: 


(a)
the loss in the value to [the nonbreaching party] of the other party’s
performance caused by its failure or deficiency, plus


(b)
any other loss, including incidental or consequential loss, caused by the
breach, less


(c)
any cost or other loss that [the nonbreaching party] has avoided by not having
to perform.


 


McGee Constr. Co. v. Neshobe
Dev. Inc., 156 Vt. 550, 557, 594 A.2d 415, 419 (1991) (quoting Restatement
(Second) of Contracts § 347); see also WSP, Inc. v. Wyo. Steel Fabricators
and Erectors, Inc., 2007 WY 80, ¶ 21, 158 P.3d 651 (“As a type of
consequential damages, lost profits are merely one measure of
damages.”).       


¶ 33.      
Here, defendant claimed consequential damages in the form of lost
profits from the loss of three particular customers.[3]  It is also clear, however, that
defendant sought in the alternative to measure its loss by the value of the
non-competition agreement, as evidenced by the separate consideration assigned
to that arrangement.  Defendant expressly contended that it paid $30,000
for the non-competition agreement but received nothing in return.  


¶ 34.      
In order to award consequential damages based on lost profits, the jury
must “estimate the amount within reasonable limits based upon the evidence
before it.”  Lemnah v. Am. Breeders Serv., Inc., 144 Vt. 568, 580,
482 A.2d 700, 707 (1984).  Difficulty in computing damages does not
necessarily preclude the jury from awarding damages if there is “sufficient
evidence from which it could have made a reasonable determination of
damages.”  Id.; see also Smith v. Country Village Int’l, Inc.,
2007 VT 132, ¶ 9, 183 Vt. 535, 944 A.2d 240 (rejecting damages recovery
where evidence could not establish either direct or consequential damages).[4]  In particular, when a plaintiff has
sought consequential damages as a result of a breach of a non-competition
provision, we have stressed that “[t]he proper measure of damages for breach of
a non-competition agreement is the plaintiff’s provable loss and not the gain
accruing to the defendant by reason of the breach.”  Vt. Elec. Supply
Co. v. Andrus, 135 Vt. 190, 192, 373 A.2d 531, 532 (1977).  Moreover,
a litigant must establish that consequential damages “pass the tests of
causation, certainty and foreseeability, and, in addition, be reasonably
supposed to have been in the contemplation of both parties at the time they
made the contract.”  A. Brown, Inc. v. Vt. Justin Corp., 148 Vt.
192, 196, 531 A.2d 899, 902 (1987).  


¶ 35.      
In this case, we agree with the trial court that defendant failed to
establish consequential damages with the type of specificity that would permit
a fact finder to make an appropriate and rational award.  See Ferrisburgh
Realty Investors v. Schumacher, 2010 VT 6, ¶ 26, 187 Vt. 309, 992 A.2d
1042 (noting, in affirming post-verdict judgment for defendant, that
“[plaintiff] identifies no evidence in the record whatsoever that would support
such a large award of damages” in claim for breach of covenant of good faith
and fair dealing).


¶ 36.       Defendant
alleged that it lost diesel revenue of about $60,000 a year from three former
customers: Packard Fuels, J.M. McDonald, and Bolduc Auto Salvage. 
Defendant also alleged that it suffered a reduction in transportation revenue
from home-heating oil of about $80,000 a year, excluding the impact of a
potential offset for a brief period.  Even assuming that defendant could
establish that the lost revenues were caused by a breach, see A. Brown,
142 Vt. at 196, 531 A.2d at 902, the jury had “nothing at all to go on” in
determining any corresponding loss of profits, as the trial court noted. 
Absent any understanding of profit margins, the jury would be unable to
rationally translate these lost revenues into a reasonable estimate of lost
profits.  The trial court, therefore, properly declined to submit the
claim for consequential damages to the jury. 


¶ 37.      
Nevertheless, defendant’s inability to establish consequential damages
does not foreclose all remedies for a breach of non-competition
agreement.  Consequential damages are merely one way to determine a remedy
in a breach of contract action.  Cf. Tour Costa Rica v. Country
Walkers, Inc., 171 Vt. 116, 124, 758 A.2d 795, 802 (2000) (discussing range
of breach of contract remedies in promissory estoppel case, including
expectation damages, restitution, and reliance damages).  Restitution, or
a refund of the consideration paid, may be available as an alternative measure
of damages.  See Morris v. Homco Int’l, Inc., 853 F.2d 337, 346
(5th Cir. 1988) (citing Restatement (Second) of Contracts § 373 (1979) in
support of “general rule” that “restitution may be had only as an alternative
to damages for actual losses resulting from a breach, not in addition to such
damages” in non-competition case based on Louisiana law); see also D. Dobbs,
Law of Remedies § 4.1(1), at 552 (2d ed. 1993) (“Restitution is often an
appropriate remedy for breach of an enforceable contract, whether or not there
is a ‘rescission’ of that contract.”).  When awarded to remedy a breach of
contract, restitution is an appropriate remedy at law for the unjust enrichment
that would occur if a breaching party to the contract were permitted to retain
the benefit of the plaintiff’s performance.  Tour Costa Rica, 171
Vt. at 124, 758 A.2d at 802; see also Restatement (Second) of Contracts
§ 373(1) (1981) (“[O]n a breach by non-performance . . . the
injured party is entitled to restitution for any benefit that he has conferred
on the other party by way of part performance or reliance.”).[5]  Indeed, such a measure of the loss
suffered by a plaintiff may be the most appropriate where consequential
damages, such as lost profits, are speculative and thus difficult to
establish.         


¶ 38.      
We hold that defendant is entitled to claim the return of the
consideration as an alternative form of contractual relief if the jury
concludes that plaintiff breached the terms of the non-competition
agreement.  In light of the potential remedy of the consideration refund,
we hold that the trial court erred in granting plaintiff’s motion for judgment
as a matter of law on defendant’s claims arising from the non-competition
agreement and therefore reverse and remand on this issue.   


Affirmed as to defendant’s counterclaim under the
Vermont Consumer Fraud Act; reversed and remanded with respect to the trial
court’s grant of judgment as a matter of law on defendant’s counterclaims for
breach of contract and breach of the covenant of good faith and fair dealing.


 



 
  

 

 
 
  

 

 
 
 FOR THE COURT:

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
  

 

 
 
 Chief
 Justice

 
  

 
  

 
  

 

  














[1]  The disposed-of claims include
plaintiff’s claims for: (1) breach of contract for defendant’s nonpayment of
one month’s supply of gasoline, (2) breach of the covenant of good faith and
fair dealing for defendant’s gross neglect in managing the wholesale-fuel
distributorship, (3) breach of the non-compete agreement for defendant’s
failure to pay the final installment, and (4) breach of fiduciary duty owed by
defendant to the fuel distributorship.  Defendant’s counterclaims for (1)
unpaid fees for transporting plaintiff’s distributorship’s gasoline, (2)
intentional or negligent interference with contractual relations for
interfering with defendant’s opportunity to deliver gasoline for Evans, (3)
breach of the post-closing agreement for failing to pay for his management of
plaintiff’s wholesale distributorship, and (4) breach of the covenant of good
faith and fair dealing regarding this management were also disposed of prior to
trial.  







[2] 
Plaintiff also argues that the evidence was insufficient as a matter of law for
the jury to conclude that plaintiff breached the non-compete agreement. 
This argument was never raised in either plaintiff’s motion for judgment as a
matter of law under Rule 50(a), or in its renewed motion under Rule
50(b).  Rather, plaintiff explicitly argued that the basis of both motions
was the “contention that the [non-competition provision breach] claim fails
because [defendant] has failed to establish damages.”  Therefore, because
this issue was not raised in either of plaintiff’s motions for judgment as a
matter of law, we do not address this issue on appeal.  Likewise, we do
not address whether the non-competition agreement permits apportionment of
damages proportional to defendant’s loss in the event that the jury finds that
plaintiff breached the agreement. 


 







[3] 
Given our conclusion regarding the insufficiency of the evidence to establish
consequential damages, we need not address plaintiff’s contention that
defendant failed to properly plead its claim for these damages.  See
V.R.C.P. 9(g) (“When items of special damage are claimed, they shall be
specifically stated.”); see also Vineyard Brands, Inc. v. Oak Knoll Cedar,
155 Vt. 473, 483, 587 A.2d 77, 82 (1990) (lost profits are special damages that
must be specifically stated).     


 







[4] 
We recognize that our language in Smith was perhaps overbroad and may
have led to confusion with respect to the elements necessary to establish a
breach of contract as opposed to the evidence necessary to permit the recovery
of either direct or consequential damages as a result of that breach.  See
2007 VT 132, ¶ 9 (“To prove breach of contract, plaintiff must show
damages.”); id. ¶ 10 (“Failure to prove damages is fatal to a claim
for breach of contract.”); see also Ianelli v. U.S. Bank, 2010 VT 34,
¶ 16, 187 Vt. 644, 996 A.2d 722 (citing Smith,
2007 VT 132, ¶ 10) (“If damages are not proven, a breach of contract claim
will fail.”).  Failure to prove damages is fatal not to an action
for breach of contract, as it would be for most tort actions, but rather to
recovery on the basis of those damages.  The overbroad language in Smith
derived from our holding in Dufresne-Henry Engineering Corporation v.
Gilcris Enterprises, Inc., 136 Vt. 274, 388 A.2d 416 (1978). Dufresne-Henry
dealt with a suit to recover the value of services rendered, an action based on
quantum meruit rather than breach of contract, and the failure to adequately
establish damages therefore precluded any recovery.  Id. at 277,
388 A.2d at 419.  In Smith, we also cited Donovan v. Towle,
99 Vt. 464, 472, 134 A. 588, 591 (1926), which was an action for fraud in
which, unlike breach of contract, “fraud without damage, or damage without
fraud, will not sustain [the] action.”  In Smith, the real issue,
although inartfully framed as a failure to establish damages, was that the
alleged breach never occurred because the plaintiff was never entitled to the
losses he sought to recover.  


 







[5] 
The Restatement (Second) of Contracts limits the availability of contractual
restitution damages of this type by expressly excluding situations in which the
injured party “has performed all of his duties under the contract and no
performance by the other party remains due other than payment of a
definite sum of money for that performance.”  § 373(2) (emphasis
added).  This limitation does not apply to this case because plaintiff’s
performance due under the non-compete agreement was not a payment but rather
fulfillment of his promise to not compete.